OPINION
 

 KING, Circuit Judge:
 

 RCI Technology Corporation appeals from an order entered in the District of Maryland affirming the bankruptcy court’s ruling in favor of Sunterra Corporation.
 
 RCC Tech. Corp. v. Sunterra Corp.,
 
 287 B.R. 864 (D.Md.2003).
 
 [1]
 
 RCI contends that the district court erred in ruling that Sun-terra, as the Chapter 11 debtor in possession, was entitled to assume a nonexclusive license of copyrighted software.
 
 [2]
 
 On appeal, we are called upon to decide whether, pursuant to 11 U.S.C. § 365(c), such a debtor in possession may assume, over the licensor’s objection, a nonexclusive software license. In so deciding, we must resolve the issue of whether the disjunctive term “or,” as used in the “assume or assign” language of § 365(c), should be construed in the conjunctive as “and.” Because we are unable to so construe § 365(c), Sunterra was precluded from assuming the nonexclusive software license, and we reverse and remand.
 

 I.
 

 A.
 

 At all times material to this appeal, RCI conducted business as a software development company for the resort and hospitality industry. RCI’s software products were used by entities in this industry, such as Sunterra, for functions such as recording reservations, managing resort properties, and marketing and financing timeshares.
 
 [3]
 
 Sunterra owns or controls more than 150 subsidiaries and related entities, constituting one of the world’s largest resort management businesses.
 

 In the 1990s, Sunterra launched a program called Club Sunterra. Membership in the Club allowed timeshare owners at Sunterra resorts to trade their timeshare rights for such rights at other Sunterra resorts. Because tens of thousands of timeshare owners and units were involved in the Club, Sunterra needed to develop an integrated computer system to assist its management of the Club. For this purpose, Sunterra decided to acquire RCI’s Premier Software
 
 [4]
 
 and modify it into a unique computer program, the SWORD System.
 

 In 1997, RCI and Sunterra entered into a software license agreement (the “Agreement”), pursuant to which RCI granted Sunterra a nonexclusive license to use Premier Software (the “Software”). Under the Agreement, effective December 31, 1997, RCI was required to provide Sunter-ra a “non-exclusive, worldwide, perpetual, irrevocable, royalty-free license to ... use, copy, modify, and distribute” the Software (the “License”). Agreement § 3.1. Sunter-
 
 *261
 
 ra paid RCI $3.5 million for the License. Because the Software, as marketed, did not meet Sunterra’s requirements, the Agreement authorized Sunterra to utilize the Software to develop its own software system. Under the Agreement, Sunterra owned any enhancements it made to the Software (the “Sunterra Enhancements”).
 
 Id.
 
 §§ 2.15, 3.6.3. Sunterra, in turn, granted RCI a license to use the Sunterra Enhancements.
 
 Id.
 
 § 3.2.2. Sunterra thereafter invested approximately $38 million in developing the SWORD System.
 

 B.
 

 On May 31, 2000, Sunterra filed a Chapter 11 bankruptcy petition in the District of Maryland. Two years later, on June 21, 2002, the bankruptcy court confirmed Sun-terra’s Plan of Reorganization, effective July 29, 2002. Prior to the Plan’s confirmation, on March 28, 2002, RCI filed a motion to have the court deem the Agreement rejected (the “Motion”). RCI claimed that the Agreement was an execu-tory contract and that Sunterra, as debtor in possession, was precluded by 11 U.S.C. § 365(c) (hereinafter” § 365(c)” or the “Statute”) from assuming the Agreement without RCI’s consent.
 
 [5]
 
 RCI maintained that, because it had refused to consent to assumption of the Agreement, the court was required by law to deem the Agreement rejected.
 

 Sunterra opposed the Motion, asserting that the Statute was inapplicable because the Agreement was not an executory contract.
 
 [6]
 
 Sunterra also maintained that it was not precluded from assuming the Agreement because the Statute should be interpreted as prohibiting a debtor in possession from assuming
 
 and
 
 assigning a contract, and it intended only to assume— not to assign. Finally, Sunterra contended that the Statute did not prohibit assumption of the Agreement because RCI had agreed to permit reasonable assignments thereof.
 

 On June 6, 2002, the bankruptcy court relied on
 
 Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,
 
 756 F.2d 1043 (4th Cir.1985), and held, in a bench ruling, that the Statute did not prohibit Sunterra, as debtor in possession, from assuming the Agreement. It decided that the Agreement was not an executory contract and that, if it were, the Statute did not preclude assumption because Sunterra did not intend to assign the Agreement. The court concluded that prohibiting Sun-terra from assuming the Agreement' was nonsensical because RCI would not be damaged if Sunterra, as debtor in possession, assumed the very contract rights it
 
 *262
 
 had possessed prior to bankruptcy. The following day, on June 7, 2002, the court entered an order denying the Motion.
 
 In re Sunterra Corp.,
 
 No. 00-5-6931-JS (Bankr.D.Md.).
 

 On June 14, 2002, RCI appealed the bankruptcy court’s decision to the district court, which, on January 10, 2003, affirmed.
 
 RCC Tech. Corp. v. Sunterra Corp.,
 
 287 B.R. 864 (D.Md.2003) (the “Opinion”). The district court disagreed with the bankruptcy court’s finding that the Agreement was not executory, but concluded that the Statute did not preclude Sunterra, as debtor in possession, from assuming it.
 

 In its Opinion, the district court acknowledged that the Statute, read literally, precluded Sunterra, as debtor in possession, from assuming the Agreement because: (1) copyright law excused RCI from accepting performance from a party other than Sunterra,
 
 [7]
 
 and (2) RCI did not consent to Sunterra’s assumption of the Agreement.
 
 Id.
 
 at 865. In explaining its ruling, the court recognized the existence of a circuit split on the issue of whether the Statute should be applied literally. It acknowledged that at least three circuits, the Third, Ninth, and Eleventh, as well as several bankruptcy courts, have followed a “literal test” (generally called the “hypothetical test”) in applying the Statute to the assumption of executory contracts.
 
 [8]
 

 See In re West Elecs., Inc.,
 
 852 F.2d 79, 83 (3d Cir.1988) (characterizing § 365(c)(1)(A) as posing “a hypothetical question”);
 
 In re Catapult Entm’t, Inc.,
 
 165 F.3d 747, 750 (9th Cir.1999) (same);
 
 In re James Cable Partners,
 
 27 F.3d 534, 537 (11th Cir.1994) (same);
 
 In re Catron,
 
 158 B.R. 629, 633-38 (E.D.Va.1993) (same),
 
 aff'd without op.,
 
 25 F.3d 1038 (4th Cir.1994). On the other hand, the First Circuit, along with a majority of the bankruptcy courts, have applied the “actual test” in such circumstances.
 
 [9]
 

 See Institut Pasteur v. Cambridge Biotech Corp.,
 
 104 F.3d 489, 493 (1st Cir.1997) (rejecting the literal test in favor of the actual test);
 
 see also In re Catapult,
 
 165 F.3d at 749 n. 2 (collecting bankruptcy court decisions adopting actual test).
 

 In its Opinion, the district court recognized that resolution of the dispute turned on which of the two tests applied. If the
 
 *263
 
 literal test applied, Sunterra could not assume the Agreement because RCI was excused, pursuant to applicable copyright law, from accepting performance from a
 
 hypothetical
 
 third party. On the other hand, if the actual test applied, Sunterra, as debtor in possession, was entitled to assume the Agreement because it did not intend to assign, and RCI would not
 
 actually
 
 be forced to accept performance from a party other than Sunterra. The court then adopted the actual test, interpreting the disjunctive “or” in the conjunctive as “and,” and holding that, because RCI would not, in the circumstances, be forced to accept performance from a party other than Sunterra, the Statute did not preclude it from assuming the Agreement.
 
 [10]
 

 Finally, the district court addressed Sunterra’s contention that, because RCI had agreed that it would not unreasonably withhold its consent regarding future assignments of the License by Sunterra, RCI had impliedly consented for Sunterra, as debtor in possession, to assume the Agreement. The court deemed unpersuasive Sunterra’s contention that RCI consented to assumption of the Agreement. It determined, however, that its adoption and application of the actual test rendered the consent issue moot. It thus affirmed the bankruptcy court’s ruling that the Statute did not bar Sunterra, as debtor in possession, from assuming the Agreement. RCI has filed a timely appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 158(d).
 

 II.
 

 We review de novo the judgment of a district court sitting in review of a bankruptcy court, “applying the same standards of review that were applied in the district court.”
 
 In re Shangra-La,
 
 167 F.3d 843, 847 (4th Cir.1999). Accordingly, we review de novo the issue of whether the Agreement was an executory contract.
 
 Lubrizol,
 
 756 F.2d at 1045 (observing that issue of whether contract is executory is one of law);
 
 Bose Corp. v. Consumers Union of the United States, Inc.,
 
 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (observing that issues of law are reviewed de novo). We also review de novo an issue of statutory construction.
 
 United States v. Childress,
 
 104 F.3d 47, 50 (4th Cir.1996) (observing that issues of statutory construction are reviewed de novo).
 

 III.
 

 In its appeal, RCI contends that we should reverse for several reasons. First, it maintains that, because the plain meaning of the Statute can be applied without producing a result that is patently absurd, the court erred in failing to do so. Second, RCI contends that general bankruptcy policy cannot be relied upon to support the decision not to apply the plain meaning of the Statute. Third, RCI maintains that the Statute is unambiguous and that use of legislative history to construe the Statute was inappropriate. Finally, RCI contends
 
 *264
 
 that, if legislative history can be utilized, it does not support the Opinion.
 

 On the other hand, Sunterra maintains that, for multiple reasons, we should affirm. First, it asserts that the Statute applies only to executory contracts, and that the Agreement was not executory. Second, it contends that, if the Agreement was executory, we should affirm because courts need not apply the plain meaning of a statute to produce an absurd result or be inconsistent with clearly established legislative intent. On this point, Sunterra maintains that the literal test — interpreting the disjunctive “or” in the Statute to mean what it says — would have produced an absurd result
 
 and
 
 been inconsistent with legislative intent. Finally, Sunterra contends that the Statute does not preclude assumption of an executory contract if the nondebtor party, i.e., RCI, consents to the assignment, and RCI, in section 5.11 of the Agreement,
 
 impliedly
 
 consented to reasonable assignments. Sunterra asserts that assumption was “automatically reasonable” because it would leave undisturbed the identity of Sunterra as the licensee. Sunterra contends, therefore, that we should affirm because RCI had consented to assumption of the Agreement by Sunterra as debtor in possession. We address these issues in turn.
 

 A.
 

 First, Sunterra contends that the Statute does not prohibit assumption of the Agreement because the Statute applies only to executory contracts and the Agreement was not executory.
 
 [11]
 
 In assessing whether a contract is executory, we are obliged, under
 
 Lubrizol,
 
 756 F.2d at 1045, to apply what courts have referred to as the Countryman Test. Under the Countryman Test, a contract is executory if the “ ‘obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other.’ ” .
 
 Gloria Mfg. Corp. v. Int’l Ladies’ Garment Workers’ Union,
 
 734 F.2d 1020, 1022 (4th Cir.1984) (quoting Countryman,
 
 Executory Contracts in Bankruptcy: Part I,
 
 57 Minn. L.Rev. 439, 460 (1973)). Applying the Countryman Test, the Agreement was not executory unless it was executory as to
 
 both
 
 Sunterra and RCI when Sunterra petitioned for bankruptcy.
 
 [12]
 
 We must therefore assess whether, at the time of the Chapter 11 filing, the obligations of both Sunterra and RCI were so unperformed that the failure of either to complete performance would constitute a material breach of the Agreement.
 

 On this point, we agree with the district court that the Agreement was ex-ecutory when Sunterra petitioned for bankruptcy. When the bankruptcy petition was filed, each party owed at least one continuing material duty to the other under the Agreement — they each possessed an ongoing obligation to maintain the confidentiality of the source code of the software developed by the other, i.e., the Software and the Sunterra Enhancements.
 
 [13]
 
 Agreement §§ 3.1.3, 3.2.2, 3.10, 3.11.
 

 
 *265
 
 B.
 

 If the Agreement was executory, Sunterra agrees that a straightforward application of the Statute prohibits it from assuming the Agreement without RCI’s consent. More specifically, Sunterra acknowledges that § 365(c) is drawn in the disjunctive and, by its plain language, prohibits Sunterra from “assuming
 
 or
 
 assigning,” rather than from “assuming
 
 and
 
 assigning,” the Agreement. And as a settled principle, “unless there is some ambiguity in the language of a statute, a court’s analysis must end with the statute’s plain language-”
 
 Hillman v. I.R.S.,
 
 263 F.3d 338, 342 (4th Cir.2001) (citing
 
 Caminetti v. United States,
 
 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)) (the “Plain Meaning Rule”).
 

 Sunterra maintains that the Plain Meaning Rule has no application here, relying on the two narrow exceptions to application of a statute’s plain language. The first such exception, premised on absurdity, exists “when literal application of the statutory language at issue results in an outcome that can truly be characterized as absurd, i.e., that is so gross as to shock the general moral or common sense.... ”
 
 Id.
 
 (quoting
 
 Sigmon Coal Co. v. Apfel,
 
 226 F.3d 291, 304) (4th Cir.2000) (internal quotation marks omitted),
 
 aff'd sub nom. Barnhart v. Sigmon Coal Co.,
 
 534 U.S. 438, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002). The second exception is premised on legislative intent, and it exists only “when literal application of the statutory language at issue produces an outcome that is demonstrably at odds with clearly expressed congressional intent....”
 
 Id.
 
 A reviewing court may look beyond the plain language of an unambiguous statute only when one of these exceptions is implicated.
 
 Sigmon Coal,
 
 226 F.3d at 304. And we have recognized that “the instances in which either of these exceptions to the Plain Meaning Rule apply ‘are, and should be, exceptionally rare.’”
 
 Hillman,
 
 263 F.3d at 342 (quoting
 
 Sigmon Coal,
 
 226 F.3d at 304).
 

 Sunterra maintains that we should affirm because, although the plain language of the Statute precludes its assumption of the Agreement, application of the literal test produces a result that is
 
 both
 
 absurd and demonstrably at odds with clearly expressed legislative intent. Specifically, Sunterra contends that we should reject the plain meaning of the Statute, and read the disjunctive “or” as the conjunctive “and,” for three reasons: (1) the plain meaning of § 365(c) is absurd because it creates internal inconsistencies therein; (2) the plain meaning of § 365(c) is absurd because it is inconsistent with general bankruptcy policy; and (3) the plain meaning of § 365(c) is incompatible with its legislative history. We examine these contentions in turn.
 

 1.
 

 Sunterra maintains that adherence to the Plain Meaning Rule produces an absurd result because it sets § 365(c) at war with itself and its neighboring statutory provisions. Specifically, Sunterra maintains that a literal reading of § 365(c) implicates the absurdity exception because it renders inoperative and superfluous § 365(f)(1),
 
 [14]
 
 as well as the phrase “or the debtor in possession” found in
 
 *266
 
 § 365(c)(1)(A). Sunterra, relying on
 
 Sutherland Statutory Construction,
 
 contends that we should interpret § 365(c) to minimize any discord among the provisions of § 365 and, if possible, construe § 365(c) so that none of § 365 is inoperative or superfluous. 2A Norman J. Singer,
 
 Sutherland Statutory Construction
 
 § 46.06 (5th ed. 1992) (“A statute should be construed so that effect is given to all its provisions, [and] so that no part will be inoperative or superfluous.... ”).
 

 a.
 

 In support of its inconsistency contention, Sunterra first maintains that it is absurd to read § 365(c)(1) literally because such a reading renders § 365(f)(1) inoperative and superfluous. The asserted inconsistency between § 365(c)(1) and § 365(f)(1) arises from use of the term “applicable law” in each provision.
 
 In re Catapult,
 
 165 F.3d at 751. Subsection (c)(1) bars assumption (absent consent) when “applicable law” would bar an assignment. And subsection (f)(1) provides that,
 
 contrary provisions in applicable law notwithstanding,
 
 executory contracts may be assigned. Of course, the assumption of an executory contract is a necessary prerequisite to its assignment under § 365.
 
 See
 
 11 U.S.C. § 365(f)(2)(A) (providing that trustee may assign executory contract only if trustee first assumes such contract in accordance with provisions of § 365). A literal reading of § 365(c)(1), therefore, initially appears to render § 365(f)(1) inoperative or superfluous.
 

 The Sixth Circuit, in its decision in
 
 In re Magness,
 
 squarely addressed the issue of whether the seemingly warring provisions of § 365(c)(1) and § 365(f)(1) are reconcilable.
 
 In re Magness,
 
 972 F.2d 689, 695 (6th Cir.1992). In so doing, the court acknowledged that “section 365(c), the recognized exception to 365(f), appears at first to resuscitate in full the very anti-assignment 'applicable law’ which 365(f) nullifies.”
 
 Id.
 
 As the court observed, however, the conflict between § 365(c)(1) and § 365(f)(1) is illusory, because “each subsection recognizes an ‘applicable law’ of markedly different scope.”
 
 Id.; accord In re James Cable,
 
 27 F.3d at 537-38;
 
 In re Lil' Things, Inc.,
 
 220 B.R. 583, 590-91 (Bankr.N.D.Tex.1998);
 
 In re Antonelli,
 
 148 B.R. 443, 448 (D.Md.1992),
 
 aff'd without op.,
 
 4 F.3d 984 (4th Cir.1993). First, § 365(f)(1) lays out the broad rule — “a law that, as a general matter, ‘prohibits, restricts, or conditions the assignment’ of executory contracts is trumped by the provisions of subsection (f)(1).”
 
 In re Catapult,
 
 165 F.3d at 752 (citing
 
 In re James Cable,
 
 27 F.3d at 538;
 
 In re Magness,
 
 972 F.2d at 695). Section 365(c)(1), in contrast, creates a carefully crafted exception to the broad rule, under which “applicable law does not merely recite a general ban on assignment, but instead more specifically ‘excuses a party ... from accepting performance from or rendering performance to an entity’ different from the one with which the party originally contracted.... ”
 
 Id.
 
 Therefore, under the broad rule of § 365(f)(1), the “applicable law” is the law prohibiting or restricting assignments as such; whereas the “applicable law” under § 365(c)(1) embraces “legal excuses for refusing to render or accept performance, regardless of the contract’s status as ‘assignable’ .... ”
 
 In re Magness,
 
 972 F.2d at 699 (Guy, J., concurring).
 

 In order to determine whether a law is overridden by § 365(f)(1) under the foregoing interpretation of § 365(f)(1) and § 365(c)(1), a court must ask
 
 why
 
 “applicable law” prohibits assignment.
 
 In re Catapult,
 
 165 F.3d at 752 (citing
 
 In re Magness,
 
 972 F.2d at 700 (Guy, J., concurring);
 
 In re Antonelli,
 
 148 B.R. at 448). And only applicable anti-assignment law predi
 
 *267
 
 cated on the rationale that the identity of the contracting party is material to the agreement is resuscitated by § 365(c)(1).
 
 Id.
 
 Premised on this interpretation, we agree with those Circuits that apply § 365(c)(1) literally — the provisions of § 365(c)(1) are not inevitably set at odds with the provisions of § 365(f)(1).
 
 In re Catapult,
 
 165 F.3d at 752;
 
 In re James Cable,
 
 27 F.3d at 538;
 
 In re Magness,
 
 972 F.2d at 695.
 

 b.
 

 The second pillar of Sunterra’s inconsistency contention is that a literal reading of § 365(c)(1) creates a conflict within itself. Specifically, Sunterra contends that § 365(c)(1) cannot be read literally because, when so read, the phrase “or the debtor in possession” found in § 365(c)(1)(A) is rendered inoperative and superfluous. Certain bankruptcy courts have agreed with Sunterra’s contention, observing, for example, that, “[i]f the directive of Section 365(c)(1) is to prohibit assumption whenever applicable law excuses performance relative to
 
 any
 
 entity other than the debtor, why add the words ‘or debtor in possession?’ The [literal] test renders this phrase surplusage.”
 
 In re Hartec Enters., Inc.,
 
 117 B.R. 865, 871-72 (Bankr.W.D.Tex.1990);
 
 accord In re Fastrax, Inc.,
 
 129 B.R. 274, 277 (Bankr.M.D.Fla.1991);
 
 In re Cardinal Indus., Inc.,
 
 116 B.R. 964, 979 (Bankr.S.D.Ohio 1990). As the Ninth Circuit has recognized, however, this position is untenable because “[a] close reading of § 365(c)(1) ... dispels this notion.”
 
 In re Catapult,
 
 165 F.3d at 752.
 

 By its plain language, § 365(c)(1) addresses
 
 both
 
 assumption and assignment.
 
 Id.
 
 An assumption and an assignment are “two conceptually distinct events,” and the nondebtor must consent to each independently.
 
 Id.
 
 Under the plain language of § 365(c)(1), therefore,
 
 two independent events
 
 must occur before a Chapter 11 debtor in possession is entitled to assign an executory contract. The debtor in possession must first obtain the nondebtor’s consent to assume the contract, and it must thereafter obtain the nondebtor’s consent to assign the contract. Therefore, “where a nondebtor consents to the
 
 assumption
 
 of an executory contract, § 365(c)(1) will have to be applied a second time if the debtor in possession wishes to
 
 assign
 
 the contract in question.”
 
 Id.
 
 And in the second application of § 365(c)(1), the issue is whether “applicable law excuses a party from accepting performance from or rendering performance to an entity other than ...
 
 the debtor in possession.”
 
 11 U.S.C. § 365(c)(1)(A) (emphasis added). We agree, therefore, that the phrase “debtor in possession,” far from being rendered inoperative or superfluous by a literal reading of subsection (c)(1), dovetails neatly with the disjunctive language therein: “The trustee may not assume
 
 or
 
 assign....” 11 U.S.C. § 365(c) (emphasis added);
 
 see In re Catapult,
 
 165 F.3d at 752.
 

 In light of the foregoing, Sunterra’s inconsistency contention also lacks merit— the Statute may be read literally without creating an irreconcilable conflict within itself or with its neighboring statutory provisions.
 

 2.
 

 Sunterra next maintains that the bankruptcy court and the district court properly declined to read the Statute literally, correctly concluding that to do so would produce a result that is inconsistent with general bankruptcy policy. Those courts declined to adhere to the Plain Meaning Rule because they concluded that a literal reading of the Statute conflicts with general bankruptcy policy, implicating the ab
 
 *268
 
 surdity and intent exceptions to the Rule. Indeed, the district court decided that the result produced by the plain language of the Statute was “quite unreasonable.” Opinion at 866. We turn to Sunterra’s contention that the intent and absurdity exceptions apply here.
 

 a.
 

 We first assess whether a conflict between the Statute and general bankruptcy policy implicates the absurdity exception to the Plain Meaning Rule. The district court refused to read § 365(c) literally because it viewed the result produced by such a reading to be “quite unreasonable.” In assessing whether a plain reading of a statute implicates the absurdity exception, however, the issue is not whether the result would be “unreasonable,” or even “quite unreasonable,” but whether the result would be
 
 absurd. See Maryland State Dep’t of
 

 Educ. v. U.S. Dep’t of Veterans Affairs,
 
 98 F.3d 165, 169 (4th Cir.1996).
 

 Sunterra maintains that reading § 365(c) literally is absurd because such a reading conflicts with the general bankruptcy policy of fostering a successful reorganization and maximizing the value of the debtor’s assets. RCI, on the other hand, asserts that reading § 365(c) literally is not absurd because Congress did not sacrifice every right of a nondebtor party to the reorganization process, and that courts should not assume that “sections of the Bankruptcy Code unfavorable to the debtor were enacted in error.” RCI observes that the Bankruptcy Code contains many provisions preserving the rights of non-debtor parties from its general debtor-favorable application (the “Nondebtor Provisions”).
 
 See, e.g.,
 
 11 U.S.C. §§ 362(b) (listing exceptions to automatic stay, authorizing nondebtor parties to exercise their nonbankruptcy rights notwithstanding § 362(a)), 555-557, 559, 560 (protecting rights of nondebtor party under securities contracts, commodities contracts, grain storage contracts, repurchase agreements, and swap agreements, from effects of automatic stay, avoidance powers, and provisions of § 365). In response, Sunterra acknowledges that “anyone looking at § 365 appreciates that the Bankruptcy Code balances non-debtor rights with those of a debtor-in-possession.” Sunterra maintains, however, that most of the Non-debtor Provisions address particular grievances of an identifiable constituency, or were enacted in response to particular court decisions. Sunterra contends, therefore, that the mere existence of such provisions does not make it plausible that, in enacting the Statute, Congress intended to preclude Chapter 11 debtors from assuming executory contracts existing prior to the bankruptcy filing.
 

 To the contrary, the existence of the Nondebtor Provisions makes it plausible that Congress meant what it said in the Statute. And as Judge Trader observed in
 
 Sigmon Coal,
 
 if it is plausible that Congress intended the result compelled by the Plain Meaning Rule, we must reject an assertion that such an application is absurd.
 
 Sigmon Coal,
 
 226 F.3d at 308 (holding statute not absurd because, although literal application of statute produced somewhat anomalous result, plausible explanation edsted). In these circumstances, application of the Plain Meaning Rule does not produce a result so grossly inconsistent with bankruptcy policy as to be absurd.
 

 b.
 

 We turn next to Sunterra’s contention on the intent exception. Affirming the bankruptcy court, the district court decided that the actual test, reading the disjunctive “or” as the conjunctive “and,” is “far
 
 *269
 
 more harmonious” with bankruptcy policy than the literal test. Opinion at 866. Relying on
 
 United States v. Ron Pair Enterprises, Inc.,
 
 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), the court declined to apply the plain meaning of the Statute, declaring that, “[although the plain meaning of statutes must generally be enforced, there is a competing principle that statutes should not be interpreted to produce results that are
 
 unreasonable in light of the drafters’ intentions.” Id.
 
 The court then ruled that, because the literal test produced a result that conflicted with the goals of Chapter 11, it need not apply the plain meaning of the Statute.
 
 Id.
 

 In its
 
 Ron Pair
 
 decision, the Supreme Court held that a statute’s “plain meaning should be conclusive except in the ‘rare cases [in which] the literal application of [the] statute will produce a result
 
 demonstrably at odds
 
 with the intentions of its drafters.’ ” 489 U.S. at 242, 109 S.Ct. 1026 (quoting
 
 Griffin v. Oceanic Contractors, Inc.,
 
 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)) (emphasis added). Under
 
 Ron Pair,
 
 therefore, a court is obliged to apply the Plain Meaning Rule unless the party contending otherwise can
 
 demonstrate
 
 that the result would be contrary to that intended by Congress. Requiring a demonstration that the plain meaning of a statute is at odds with the intentions of its drafters is a more stringent mandate than requiring a showing that the statute’s literal application is unreasonable in light of bankruptcy policy.
 

 Some bankruptcy commentators maintain that sound bankruptcy policy supports adoption of the actual test.
 
 See
 
 3 Lawrence P. King,
 
 Collier on Bankruptcy
 
 § 365.06[1 ][d][iii] (15th ed. revised). As the Supreme Court has repeatedly emphasized, however, Congress is the policymaker — not the courts.
 
 Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.,
 
 530 U.S. 1, 13, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000)(citing
 
 Kawaauhau v. Geiger,
 
 523 U.S. 57, 64, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998);
 
 United States v. Noland,
 
 517 U.S. 535, 541-42, n. 3, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996);
 
 Union Bank v. Wolas,
 
 502 U.S. 151, 162, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991)). And, put simply, the modification of a statutory provision to achieve a preferable policy outcome is a task reserved to Congress.
 
 Id.
 

 As the Ninth Circuit has recognized, application of the actual test “effectively engrafts a narrow exception onto § 365(c)(1) for debtors in possession, providing that, as to them, the statute only prohibits assumption
 
 and
 
 assignment.”
 
 Catapult,
 
 165 F.3d at 754. Under the actual test, the disjunctive “or” of § 365(c) is read as the conjunctive “and,” and the term “assume” is effectively read out of the Statute. No matter how appealing such an interpretation may be from a policy standpoint, “we cannot adopt [such interpretation] as our own without trespassing on a function reserved for the legislative branch.... ”
 
 Sigmon Coal,
 
 226 F.3d at 308.
 

 In these circumstances, any perceived conflict between a literal reading of the Statute and general bankruptcy policy fails to implicate the intent exception to the Plain Meaning Rule. As we observed in
 
 Sigmon Coal,
 
 a federal court must “determine the meaning of the statute passed by Congress, not whether wisdom or logic suggests that Congress could have done better.... ”
 
 Id.
 
 We conclude, therefore, that the intent exception is not implicated here.
 

 3.
 

 Sunterra next maintains that the district court should be affirmed because a literal application of the Statute produces
 
 *270
 
 an outcome at odds with legislative history. Importantly, § 365, as it now reads, was added to the Bankruptcy Code in 1984 (the “1984 Act”), and there is no relevant legislative history for the 1984 Act.
 
 In re Cardinal,
 
 116 B.R. at 978. Sunterra contends, however, that the 1984 amendments had their genesis in a 1980 House amendment to an earlier Senate technical corrections bill. That amendment “was accompanied by ‘a relatively obscure committee report,’ ”
 
 In re Catapult,
 
 165 F.3d at 754 (quoting 1 David G. Epstein,
 
 et al., Bankruptcy
 
 § 5-15 (1992)), which states:
 

 This amendment makes it clear that the prohibition against a trustee’s power to assume an executory contract does not apply where it is the debtor that is in possession and the performance to be given or received under a personal service contract will be the same as if no petition had been filed because of the personal nature of the contract.
 

 H.R. 1195, 96th Cong., 2d Sess. § 27(b) (1980) (the “1980 Report”). The First Circuit relied on the 1980 Report in its adoption of the actual test.
 
 Summit Invest. & Dev. Corp. v. Leroux,
 
 69 F.3d 608, 613 (1st Cir.1995). Sunterra contends that a literal reading of the Statute is at odds with the 1980 Report, and that this contradiction supports its position. However, legislative history suggesting an interpretation contrary to a statute’s plain meaning is not necessarily sufficient to override the Plain Meaning Rule. In
 
 Sigmon Coal,
 
 for example, we declined to rely on legislative history to displace the plain meaning of the statute, because the history consisted merely of a statement made by a single member of Congress. 226 F.3d at 306. Although such legislative history was “worthy of consideration, [it was] simply not the sort of conclusive legislative history that would trump contrary language in the statute.”
 
 Id.
 

 For at least three reasons, the 1980 Report is not conclusive on congressional intent concerning the 1984 Act. First, the 1980 Report relates to a 1980 proposal, which was never enacted, rather than to the 1984 Act; and we have held that courts are not free to replace a statute’s plain meaning with “unenacted legislative intent.”
 
 United States v. Morison,
 
 844 F.2d 1057, 1064 (4th Cir.1988). Second, the 1980 Report was prepared several years prior to enactment of the Statute.
 
 In re Catapult,
 
 165 F.3d at 754. Finally, it reflects the views of only a single House committee.
 
 Id
 
 For these reasons, we agree with the Ninth Circuit that the 1980 Report is not “the sort of clear indication of contrary intent that would overcome the unambiguous language of subsection (c)(1).”
 
 Id.
 
 We must decline, therefore, to reject the Statute’s plain meaning on this basis.
 

 C.
 

 Finally, we turn to Sunterra’s contention that, in any event, RCI consented to Sun-terra’s assumption of the Agreement. Pursuant to the Statute, a debtor in possession may assume or assign an executory contract if the nondebtor party consents thereto. 11 U.S.C. § 365(c)(1)(B). Sun-terra maintains that RCI had agreed, in section 5.11 of the Agreement, that it would not prohibit Sunterra from transferring the License to a successor in interest if the transfer included substantially all of Sunterra’s assets, and that in so doing, RCI consented to its assumption of the License.
 

 The provision of the Agreement at issue provides that the assignment section of the Agreement shall not preclude the transfer of the License to a successor in interest of substantially all of Sunterra’s assets if the assignee agrees in writing to be bound by the License (the “Transfer
 
 *271
 
 Provision”).
 
 [15]
 
 Sunterra maintains that RCI had consented, in the Transfer Provision, to permit transfer of the License to a successor in interest under certain circumstances. RCI contends that any consent it provided to Sunterra in the Transfer Provision is irrelevant because, under the Statute, the issue is whether applicable law prohibited the transfer
 
 irrespective of the provisions of the Agreement.
 
 In support of this proposition, RCI observes that the Statute applies “whether or not such contract ... prohibits or restricts assignments of rights.... ”
 
 Id.
 
 § 365(c)(1)(A).
 

 RCI’s reliance on this aspect of the Statute’s language is misplaced. The Transfer Provision does not
 
 prohibit
 
 or
 
 restrict
 
 Sun-terra from transferring its rights under the Agreement; the Transfer Provision
 
 favors
 
 assignment — it entitles Sunterra to assign the Agreement without RCI’s consent so long as the assignment includes substantially all of Sunterra’s assets. Rather than being irrelevant, therefore, the issue of contractual consent in the Transfer Provision could be determinative of whether the Statute barred Sunterra’s assumption.
 
 See In re Midway Airlines, Inc.,
 
 6 F.3d 492, 497 (7th Cir.1993) (finding proassignment contract language determinative of assignment issue under § 365(c)). Accordingly, we must disagree with RCI that the Agreement, in
 
 permitting
 
 Sunter-ra to transfer the License to a successor in interest, is irrelevant to whether the Statute precluded Sunterra from assuming or assigning the Agreement.
 

 Finally, RCI maintains that, even if it consented to Sunterra’s transfer of the License to a successor in interest under certain circumstances, the Transfer Provision applies only to assignments, and not to assumptions. We agree. The Transfer Provision is set forth in the “Assignment” section of the Agreement, and all other provisions of that section apply, by their terms,
 
 exclusively
 
 to assignments.
 
 [16]
 

 In sum, we draw the following conclusions. RCI consented to Sunterra’s assignment of the License to a successor in interest under certain circumstances. The Transfer Provision, however, does not apply to an
 
 assumption
 
 of the Agreement by a Chapter 11 debtor in possession. Because the terms assumption and assignment describe “two conceptually distinct events,”
 
 In re Catapult,
 
 165 F.3d at 752, and because the Transfer Provision pertains to an assignment rather than an assumption, RCI did not consent to Sunterra’s assumption of the Agreement. Without RCI’s consent, Sunterra was precluded from assuming the Agreement.
 

 IV.
 

 Pursuant to the foregoing, the bankruptcy court erred, and the district court erred
 
 *272
 
 in affirming the bankruptcy court. We therefore reverse, and we remand for such other and further proceedings as may be appropriate.
 

 REVERSED AND REMANDED
 

 [1]
 

 . RCI Technology Corporation was formerly known as Resort Computer Corporation, or RCC.
 

 [2]
 

 . Pursuant to Chapter 11 of the Bankruptcy Code, a debtor in possession remains in possession of the pre-petition assets and administers them for the benefit of its creditors.
 
 In re Southeast Hotel Prop. Ltd. P’ship,
 
 99 F.3d 151, 152 n. 1 (4th Cir.1996) (citing 11 U.S.C. §§ 322, 1101(1), 1104, 1107).
 

 [3]
 

 . A timeshare has been defined as "a share in a property under a time-sharing scheme.”
 
 Oxford English Dictionary
 
 879 (Vol. 4 & Supp.1986). The term time-sharing has been described as "[t]he ownership or right of a property (esp. as a holiday home) for a fixed limited time each year.”
 
 Id.
 

 [4]
 

 . It is uncontested that RCI’s Premier Software is a copyrighted computer program registered with the United States Copyright Office.
 

 [5]
 

 . Section 365(c) of Title 11 provides, in pertinent part:(c)
 
 The trustee may not assume or assign any executory contract
 
 ... of the debt- or, whether or not such contract ... prohibits or restricts assignment of rights or delegation of duties, if—
 

 (1)(A) applicable law excuses a party, other than the debtor, to such contract ... from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract ... prohibits or restricts assignment of rights or delegation of duties; and
 

 (B) such party does not consent to such assumption or assignment....
 

 11 U.S.C. § 365(c) (emphasis added). The term "trustee,” as used in the Statute, includes a Chapter 11 debtor in possession.
 
 See, e.g., In re Catapult Entm’t, Inc.,
 
 165 F.3d 747, 750 (9th Cir.1999). And the term "applicable law” means "applicable non-bankruptcy law.”
 
 In re Pioneer Ford Sales, Inc.,
 
 729 F.2d 27, 28 (1st Cir.1984).
 

 [6]
 

 . In the context of the Statute, "a contract is executory if performance is due to some extent on both sides.”
 
 Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.,
 
 756 F.2d 1043, 1045 (4th Cir.1985).
 

 [7]
 

 . Because the Software is a duly registered copyrighted computer program, copyright law is the applicable nonbankruptcy law that would excuse RCI from accepting performance under the Agreement from an entity other than Sunterra.
 
 See, e.g., In re CFLC, Inc.,
 
 89 F.3d 673, 679 (9th Cir.1996);
 
 In re Golden Books Family Entm’t, Inc.,
 
 269 B.R. 300, 309 (Bankr.D.Del.2001).
 

 [8]
 

 . The term literal test is derived from a literal interpretation of the Statute, under which the disjunctive "or” in § 365(c) is construed to mean what it says. If § 365(c) is construed literally, "a debtor in possession may not assume an executory contract over the nondebt- or's objection if applicable law would bar assignment to a
 
 hypothetical
 
 third party, even where the debtor in possession has no intention of assigning the contract in question to any such third party.”
 
 In re Access Beyond Techs., Inc.,
 
 237 B.R. 32, 48 (Bankr.D.Del. 1999) (original emphasis omitted and emphasis added) (citing
 
 In re James Cable Partners,
 
 27 F.3d 534, 537 (11th Cir.1994);
 
 In re West Elecs., Inc.,
 
 852 F.2d 79, 83 (3d Cir.1988)). Although generally called the hypothetical test, the test is premised on a literal interpretation of the Statute, and it is more aptly referred to as the "literal test.”
 

 [9]
 

 .Under the actual test, the disjunctive "or” in § 365(c) is construed as the conjunctive "and.” In applying the actual test, therefore, a court must make a case-by-case inquiry into whether the nondebtor party would be compelled to accept performance from someone other than the party with whom it had originally contracted, and a debtor would not be precluded from assuming a contract unless it
 
 actually
 
 intended to assign the contract to a third party.
 
 Summit Invest. & Dev. Corp. v. Leroux,
 
 69 F.3d 608, 612 (1st Cir.1995).
 

 [10]
 

 . As the district court explained, the literal test has the "obvious virtue of being consistent with the dictate of the Supreme Court that the plain meaning of a statute must be enforced when its terms are unambiguous.” Opinion at 865 (citing
 
 Patterson v. Shumate,
 
 504 U.S. 753, 757-59, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992)). The court adopted the actual test, however, declaring that, although it "has the weakness of reading the statutory language 'assume or assign' to mean 'assume
 
 and
 
 assign,' .... it has the virtue of being consistent with the general goals of Chapter 11 because it allows licensees to benefit from the protections of the bankruptcy law while encouraging the maximization of the economic value of the debtor's estate.”
 
 Id.
 
 at 866, 112 S.Ct. 2242 (emphasis added) (citing
 
 In re Cardinal Indus., Inc.,
 
 116 B.R. 964, 981 (Bankr.S.D.Ohio 1990)).
 

 [11]
 

 . If the Agreement was not executory, it was not subject to the Statute, and it would have survived the bankruptcy filing unaffected.
 
 See In re Access,
 
 237 B.R. at 41.
 

 [12]
 

 . The date a bankruptcy petition is filed is the critical time for determining whether a contract is executory.
 
 See, e.g., In re Columbia Gas Sys. Inc.,
 
 50 F.3d 233, 240 (3d Cir.1995);
 
 In re Access,
 
 237 B.R. at 41 n. 10.
 

 [13]
 

 .The term source code, as used in the Agreement, means the human-readable form of the Software and the Sunterra Enhancements. Agreement § 2.19.
 

 [14]
 

 . Subsection 365(f)(1) of the Bankruptcy Code provides, in pertinent part, as follows:
 

 Except as provided in subsection (c) of this section, notwithstanding a provision in an executory contract ... of the debtor, or in
 
 applicable law,
 
 that prohibits, restricts, or conditions the assignment of such contract ..., the trustee may assign such contract ... under paragraph (2) of this subsection ....
 

 11 U.S.C. § 365(f)(1) (emphasis added).
 

 [15]
 

 . The Transfer Provision of the Agreement provides:
 

 The provisions of this section shall not preclude the transfer of this license to a successor in interest of substantially all of [Sunter-ra's] assets if the assignee agrees in writing to be bound by this License.
 

 Agreement! 5.11.
 

 [16]
 

 . In support of the proposition that RCI, by virtue of the Transfer Provision, consented to assumption of the Agreement, Sunterra relies on the Seventh Circuit decision in
 
 In re Midway Airlines.
 
 6 F.3d 492 (7th Cir.1993). The agreement at issue there, however, explicitly contemplated assumption and assignment in the bankruptcy context. The Transfer Provision, on the other hand, contemplates neither an assignment in the bankruptcy context nor an assumption.
 

 Sunterra also relies on a Louisiana bankruptcy court decision
 
 In re Supernatural Foods,
 
 268 B.R. 759 (Bankr.M.D.La.2001), to support the proposition that RCI, by the Transfer Provision, consented to assumption of the Agreement. We are unpersuaded by that decision, however, and we decline to follow it.