WYNN, Circuit Judge,
concurring:
“Judges ought to remember that their office is jus dicere, and not jus dare — to interpret law, and not to make law, or give law.” Francis Bacon, “Essay LVI: Of Judicature,” Essays (1625), reported in Richard Whately, Bacon’s Essays With Annotations 511 (1857). Here, the judiciously well-reasoned majority opinion resists the temptation to move beyond our limited role and into the colorful realm of policy. Respectfully, the dissenting opinion strays beyond our limited review here and encroaches on policy issues best left to other branches of government.
I.
First, rather than confront the issues actually in play, the dissenting opinion dresses up points of agreement as dire rifts. The dissent asserts, for example, that plaintiffs “seek to achieve through litigation a monopoly for their product” and claims that the majority opinion “turns a blind eye” to “anticompetitive im-pulséis]” driving SawStop’s claims. Post at 444, 454. The dissenting opinion claims that the majority opinion “ignores all [the benefits of ventures such as standards setters and trade groups] in its rush to flatten pleading standards, make communications perilous, and consign antitrust law to isolationist ends.” Id. at 455. Thus, the dissent takes the policy view that today’s opinion will doom “American companies” to “competitive disadvantage at the very time global commercial interactions are becoming more commonplace.” Id. Nonsense (beyond the obvious problem that a competitive disadvantage is meaningful only in the context of a comparison with America’s global competitors, many of whom also have antitrust laws).
The majority opinion fully accords with the view that “[j]oint ventures, standard-setting organizations, and trade association meetings may allow individuals of different specialties to benefit from each other’s expertise. These fora may prove invaluable *439 for efficient and effective product development.” Post at 455. As the majority opinion plainly states, “such ventures” can have “decidedly procompetitive effects by encouraging greater product interoperability, generating network effects, and building incentives to innovate.” Ante at 455 (quotation marks and citations omitted). The majority opinion in no uncertain terms affirms the district court’s dismissal of SawStop’s standards-setting-related claims — a crucial fact relegated to a dissenting footnote.
Second, rather than address SawStop’s complaint as it is written, the dissenting opinion employs verbiage like “commercial interactions ” to revise the complaint so as to omit the allegations of a secret agreement to refuse to deal. Again sounding in policy, the dissenting opinion asserts that the majority “drapefs] innocent commercial activity in sinister garb” because the complaint “hardly bespeaks a collective agreement not to deal.” Post at 443, 445. Thus, the dissenting opinion editorializes that due to the majority opinion, “HOLDING OR ATTENDING [A] TRADE ASSOCIATION MEETING WILL INCREASE YOUR EXPOSURE TO ANTITRUST SUITS.” Id. at 443 (emphasis added).
Yet, when read with a judicious eye, SawStop’s complaint clearly alleges that Defendants entered into a secret agreement to refuse to deal at a trade association meeting — not just that Defendants “held” or “attended” such meetings. Indeed, the complaint plainly bespeaks a collective agreement not to deal.
Specifically, the complaint alleges, among other things:
• “In conjunction with the [Power Tool Institute] annual meeting, a separate meeting of representatives of table saw manufacturers was held. Attendees at the meeting included, but were not necessarily limited to, Domeny (on behalf of SBTC and Bosch), Peot (on behalf of Ryobi, TIC and affiliates), Stanley Rodrigues (for Makita), Ray Mayginnes (for Emerson), David Y. Keller (of Porter-Cable, who also spoke for Pentair and DICM), Steven Karaga (for Hitachi), and representatives of B & D and Milwaukee Electric. Mr. Domeny, at the time, was the Chair of the [Power Tool Institute]^ Product Liability Committee, and chaired the meeting.” J.A. 89 ¶ 79 (emphasis added).
• “At the meeting, Mr. Domeny and the other participants expressed concerns that if one manufacturer adopted SawStop Technology, then all manufacturers would be subject to greater liability in future product liability cases. Mr. Peot shared this concern. [Power Tool Institute]’s table saw manufacturers determined at that meeting that they would decide how to respond, as an industry, to the SawS-top Technology. A consensus was reached that (1) all should take a SawStop license and/or implement AIMT, or (2) none take it or otherwise implement AIMT; since if one or more took a license and/or offered a product with AIMT, the others would be more vulnerable to product liability. It was also agreed that collective action would proceed only if all, or at least a substantial majority, of participants voted to participate. Members also discussed developing something like SawStop Technology, without having to pay a royalty to Dr. Gass. The consensus reached by the attendees, with no contrary views articulated, was that industry members would collectively agree not to purchase technology licenses from Plaintiffs or otherwise implement *440 AIMT.” J.A. 89-90 ¶ 80 (emphasis added and citations omitted).
• “The consensus reached at the meeting was based on a calculated economic determination that the manufacturers would, collectively, fare better by collectively agreeing to marginalize SawStop and AIMT, than by allowing the marketplace to determine whether any manufacturers did business with SawStop or otherwise implemented AIMT. The Defendants believed that bringing AIMT into the mass market would have catastrophic product liability consequences for them. Purchasers of their existing and prior inventories of table saws (and, perhaps, other products) would point to the viability of AIMT as evidence that other products were inherently unsafe because they lacked AIMT. Defendants believed that, in the short term, if SawS-top was unable to obtain a major manufacturing partner, it would not be able to produce or market a meaningful quantity of saws with its AIMT— this way, the major manufacturers could continue to earn current profit margins • on their existing inferior product lines without paying royalties to Plaintiffs, and it would remain (for the time being) at least plausible for the major manufacturers to contend, in defending product liability lawsuits, that AIMT was not viable. Thus, Defendant’s business calculation was that they, collectively, would fare better by marginalizing SawStop and AIMT, than by working with SawStop and/or otherwise adopting AIMT.” J.A. 90 ¶ 81.
• “It was agreed at the meeting and thereafter that all discussions concerning a collaborative response to SawStop would be conftdential and concealed from persons other than [Power Tool Institute] members who manufactured table saws. It was further agreed that, going forward, information relevant to SawStop and table saw product liability defense issues would only be shared among those industry participants who affirmatively agreed to act collectively in response to SawStop.” J.A. 90 ¶ 82 (emphasis added).
• “At, or within a period of months following the October 2001 meeting, each of Defendants Bosch, Ryobi, Makita, Hitachi, Pentair, Emerson and Milwaukee Electric, and entities affiliated with them, had agreed to enter into a boycott (the ‘AIMT Boycott’) of SawStop’s intellectual property, by collectively (1) refusing to license SawS-top technology, and (2) agreeing not to otherwise implement AIMT.” J.A. 90-91 ¶ 83 (emphasis added).
• “During this time frame, in which [Power Tool Institute]’s table saw manufacturers voted to respond collectively to SawStop Technology, those Defendants not yet in license negotiations with SawStop refrained from requesting a license, and the Defendants who were already in negotiations found ways to abort them as opportunities arose.” J.A. 91 ¶ 85 (emphasis added).
In other words, SawStop’s complaint alleges a specific meeting in which Defendants agreed to refuse to deal with SawStop and to keep that pact a secret. Around the same time, Defendants refrained from seeking SawStop’s technology or, if in licensing negotiations with SawStop, found ways to abort them. The dissenting opinion’s dismissive characterization of these detailed allegations as mere “eonclusory assertions,” post at 445, thus plainly misses the mark.
*441 On the contrary, SawStop’s allegations squarely conform to what we require Sherman Act § 1 plaintiffs to plead. “To establish a § 1 antitrust violation, a plaintiff must prove, and therefore plead, (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade.” Robertson v. Sea Pines Real Estate Companies, Inc., 679 F.3d 278, 284 (4th Cir.2012) (Wilkinson, J.) (quotation marks and citation omitted). Further, “Iqbal and Twombly do not require a plaintiff to prove his case in the complaint.” Id. at 291. Instead, the complaint “need only allege facts sufficient to state elements of the claim.” Id. (quotation marks and citations omitted). And at the Rule 12(b)(6) stage, which is where we are, the complaint is to be “construed liberally so as to do substantial justice.” Pub. Employees’ Ret. Ass’n of Colo. v. Deloitte & Touche LLP, 551 F.3d 305, 311 (4th Cir.2009) (Wilkinson, J.) (quotation marks and citation omitted).
In its revisionist account of SawStop’s allegations, the dissenting opinion essentially turns the Rule 12(b)(6) standard on its head. “A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.” Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir.1992). Instead, “a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable and that a recovery is very remote and unlikely.” Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quotation marks and citation omitted).
Despite our crystal-clear mandate in reviewing this Rule 12(b)(6) dismissal, the dissenting opinion nevertheless attacks the complaint in a light least favorable to SawStop, viewing the facts and reasonable inferences in the light most favorable to Defendants. For example, the dissenting opinion opines that “[ignoring the many practical reasons for declining [SawStopJs offers, the majority hones in on the fear of product liability as the key motivation behind defendants’ alleged boycott.” Post at 453. Yet, the majority opinion rightly focuses on the products liability reasoning— because SawStop specifically alleges, it. See, e.g., J.A. 89-91. We are thus not at liberty to swap that pled reasoning out for other “practical reasons” we might make up out of whole cloth. A further example: The dissenting opinion asserts that “it was consistent with each manufacturer’s best interest to reject an expensive, unproven, undeveloped, and possibly unsafe technology. Each defendant could easily have arrived at this business decision on its own.” Post at 452. But SawStop alleges that they didn’t arrive at that decision independently. Instead, the complaint specifically alleges that Defendants expressly agreed to refuse to deal and to keep that agreement secret. See, e.g., J.A. 89-91. Ignoring such specific allegations to SawStop’s detriment is nothing shy of an all-out perversion of the generous lens through which we 551 F.3d at 311.
Finally, the dissenting opinion focuses on its own policy preferences, thereby abandoning this Court’s limited role— which is simply to assess whether SawStop plausibly alleges the elements of its Section 1 claim. Because the majority opinion sticks to its limited role, it steers, clear of considering things like different “approach[es]” in a “globalized marketplace,” whether the word “ ‘conspiracy’ is bound to stoke paranoia,” or the appropriate amount of “lag time” in “product development.” Post at 443, 448, 452.
*442 The dissenting opinion sees itself in no way so bound and thus insists, for example, that “[h]ere, plaintiffs are the ones acting anti-competitively.” Post at 70. It is simply not our job in reviewing a Rule 12(b)(6) motion to assess which party’s conduct we deem more pro-competitive. In refusing to stick to our limited role, the dissenting opinion engages in breathtaking judicial activism.
“As the Supreme Court has repeatedly emphasized, ... Congress is the policymaker — not the courts.” In re Sunterra Corp., 361 F.3d 257, 269 (4th Cir.2004). See also, e.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 13-14, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) (“Achieving a better policy outcome ... is a task for Congress, not the courts.”). It is thus inappropriate to suggest, for example, that, as a matter of law, a boycott conspiracy may not be motivated by liability concerns. Congress can pencil such categorical limitations into the Sherman Act; we cannot.
The dissenting opinion embarks on yet another odyssey into policy, as well as assumptions untethered to reality, much less the complaint at issue here, when it asserts that “[tjhese days secrets are harder to keep. A secret is something that is held by only one. Or maybe two. But twenty-two? Managers everywhere must be relieved to learn from my concurring colleague that you can let twenty-two people in on a secret and have nothing leak out.” Post at 451. Yet in reviewing a complaint for Rule 12(b)(6) purposes, we may not peer into a crystal ball and decide how many people we personally believe can keep a secret and kick complaints out of court on such a basis.
Moreover, to the extent the dissenting opinion suggests that a large,, multi-firm conspiracy by definition cannot exist, it is simply uninformed. Large antitrust conspiracies have not only existed but have been caught — a perfect example being the famous international vitamin scandal of the 1990s — which involved 21 firms engaged in a conspiracy that lasted over a decade:
From 1988 to 1992, 21 chemical manufacturers headquartered in seven nations joined ... vitamins cartels.... Sales by these cartels exceeded $30 billion .... The pharmaceutical manufacturers involved became virtually addicted to the infusion of monopoly profits, giddy financial results that prompted the conspirators to continue their clandestine activities for up to 15 years. These illegal activities persisted in the face of [among other things] several public prosecutions of parallel conspiracies [and] multiple antitrust investigations .... The conspirators simply burrowed deeper and developed more elaborate methods of subterfuge.
John M. Connor, The Great Global Vitamins Cartels 8, available at http://ssrn. com/abstract=885968.
In other words, large, multi-player conspiracies involving elaborate ruses can indeed exist as a matter of law and fact. And here, SawStop alleges that one did, and that it undertook a group boycott to freeze SawStop technology out of the marketplace. In refusing to accept those allegations, as we must at this stage, the dissenting opinion plainly oversteps its bounds.
II.
In sum, courts exist to resolve disputes, not to pervert procedural rules into swords with which to fight policy battles. And today, we do not confront whether SawS-top should ultimately succeed on its boycott claim. Instead, we confront only whether, when viewing SawStop’s complaint with an unjaundiced eye and using *443 the proper standard, we can say that it has made allegations sufficient to withstand a motion to dismiss for failure to state such a claim. It has. Accordingly, with all due respect for the dissenting view, I join in the judicious and well-reasoned majority opinion.