PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

PUBLIC EMPLOYEES' RETIREMENT
ASSOCIATION OF COLORADO; GENERIC
TRADING OF PHILADELPHIA, L.L.C.,
　　　　*Plaintiffs-Appellants,*

　　　　v.

DELOITTE & TOUCHE LLP;
DELOITTE & TOUCHE ACCOUNTANTS,
　　　　*Defendants-Appellees.*

No. 07-1704

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(1:03-md-01539-CCB; 1:03-cv-01825-CCB)

Argued: October 28, 2008

Decided: January 5, 2009

Before WILKINSON and AGEE, Circuit Judges, and
John T. COPENHAVER, JR., United States District Judge
for the Southern District of West Virginia,
sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Judge Agee and Judge Copenhaver joined.

## COUNSEL

**ARGUED:** Andrew John Entwistle, ENTWISTLE & CAP-
PUCCI, L.L.P., New York, New York, for Appellants. Daniel

F. Kolb, DAVIS, POLK & WARDWELL, New York, New York; John T. Behrendt, GIBSON, DUNN & CRUTCHER, L.L.P., New York, New York, for Appellees. **ON BRIEF:** Johnston de F. Whitman, Jr., Richard W. Gonnello, Jordan A. Cortez, ENTWISTLE & CAPPUCCI, L.L.P., New York, New York; ADELBERG, RUDOW, DORF & HENDLER, L.L.C., Baltimore, Maryland, for Appellants. Marshall R. King, Lee G. Dunst, LaShann M. DeArcy, GIBSON, DUNN & CRUTCHER, L.L.P., New York, New York, Daniel F. Goldstein, BROWN, GOLDSTEIN & LEVY, L.L.P., Baltimore, Maryland, for Appellee Deloitte & Touche Accountants; Sharon Katz, Jane Alexandra Small, Joshua D. Liston, DAVIS, POLK & WARDWELL, New York, New York, Max H. Lauten, KRAMON & GRAHAM, P.A., Baltimore, Maryland, for Appellee Deloitte & Touche LLP.

---

**OPINION**

WILKINSON, Circuit Judge:

This class action securities fraud lawsuit arises out of improper accounting by Royal Ahold, N.V., a Dutch corporation, and U.S. Foodservice, Inc. ("USF"), a Maryland-based Ahold subsidiary. The misconduct of Ahold and USF is not disputed in this appeal; at issue is the liability of Ahold's accountants, Deloitte & Touche LLP ("Deloitte U.S.") and Deloitte & Touche Accountants ("Deloitte Netherlands"), for their alleged role in the fraud perpetrated by Ahold and USF. Under the Private Securities Litigation Reform Act ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737, plaintiffs must plead facts alleging a "strong inference" that the defendants acted with the required scienter. As recently explained by the Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007), a strong inference "must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of non-

fraudulent intent." *Id.* at 2504-05. Because we find the inference that the Deloitte defendants lacked the necessary scienter more compelling than any competing inference that they knowingly or recklessly perpetrated a fraud on Ahold's investors, we affirm the district court's judgment that plaintiffs' motion for leave to file a second proposed amended complaint was futile.

## I.

Ahold owns and operates grocery stores and food service companies in the United States and other countries. Deloitte U.S. is an American accounting firm that audited Ahold's American subsidiaries and acted as a filing reviewer for Ahold's filings with the Securities and Exchange Commission ("SEC"). Deloitte Netherlands is a Dutch accounting firm that served as Ahold's outside auditor. Although they work closely together, the two Deloittes are legally distinct entities.

Beginning in the 1990s, and continuing until 2003, Ahold perpetrated two frauds that led it to significantly overstate its earnings on financial reports. First, Ahold improperly "consolidated" the revenue from a number of joint ventures with supermarket operators in Europe and Latin America ("the JV fraud"). That is, for accounting purposes Ahold treated these joint ventures as if it fully controlled them — and thus treated all revenue from the ventures as revenue to Ahold — when in fact Ahold did not have a controlling stake. Under Dutch and U.S. generally accepted accounting principles (GAAP), Ahold should only have consolidated the revenue proportionally to Ahold's stake in the ventures.

Second, USF falsely reported its income from promotional allowances ("the PA fraud"). Also known as vendor rebates, promotional allowances ("PAs") are payments or discounts that manufacturers and vendors provide to retailers like USF in order to encourage the retailers to promote the manufacturers' products. In order to increase its stated income, USF pre-

maturely recognized income from PAs and inflated its reported PA income beyond amounts actually received.

On February 24, 2003, Ahold announced that its earnings for fiscal years 2001 and 2002 had been overstated by at least $500 million as a result of the fraudulent accounting for promotional allowances at USF and that Ahold would be restating revenues because it would cease treating the joint ventures as fully consolidated. After this announcement, Ahold common stock trading on the Euronext stock exchange and Ahold American Depository Receipts trading on the New York Stock Exchange lost more than 60% of their value. Subsequent to the February 2003 announcement, Ahold made further restatements to its earnings totaling $24.8 billion in revenues and approximately $1.1 billion in net income.

As a result of the frauds, the SEC filed civil enforcement actions against Ahold and several individual defendants. Separately, twenty-one private class action securities and ERISA actions were filed against Ahold, both Deloittes, and other defendants. On June 18, 2003, the Judicial Panel on Multidistrict Litigation transferred them to the U.S. District Court for the District of Maryland. *In re Royal Ahold N.V. Securities & "ERISA" Litig.*, 269 F. Supp. 2d 1362 (J.P.M.L. 2003). Subsequently, several more related actions were also transferred to the District of Maryland.

On November 4, 2003, the district court consolidated all the actions and designated plaintiffs Public Employees' Retirement Association of Colorado and Generic Trading of Philadelphia, LLC as Lead Plaintiffs. *In re Royal Ahold N.V. Securities and ERISA Litig.*, 219 F.R.D. 343 (D. Md. 2003). On February 18, 2004, the Lead Plaintiffs filed a Consolidated Amended Securities Class Action Complaint ("CAC") against Ahold, several Ahold subsidiaries, both Deloittes, and some of Ahold's underwriters, officers, and directors. The CAC charged Ahold, its subsidiaries, the Deloittes, and the individual defendants with violations of § 10(b) of the Securi-

ties Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5(b), as well as 10b-5(a) and (c), 17 C.F.R. § 240.10b, promulgated thereunder, and also charged some defendants with other violations of the securities laws not relevant here.

Both Deloittes moved to dismiss the CAC on several grounds. The district court on December 21, 2004, dismissed all of the claims against both Deloitte defendants for failure to state a claim, and held that with respect to the § 10(b) claims the complaint did not plead facts alleging a strong inference of scienter as required by the PSLRA. *In re Royal Ahold N.V. Securities & ERISA Litig.*, 351 F. Supp. 2d 334, 385-96 (D. Md. 2004). The district court also dismissed some but not all of the claims against the other defendants on various grounds.[1] *See id.* at 411. The plaintiffs continued the litigation on the remaining claims and proceeded with discovery. On November 28, 2005, Ahold and the Lead Plaintiffs announced a $1.1 billion settlement resolving the Class's claims against all the defendants other than Deloitte U.S. and Deloitte Netherlands.

On March 6, 2006, the Lead Plaintiffs filed a motion to amend the original complaint accompanied by a proposed Second Consolidated Amended Securities Class Action Complaint ("SAC"). The SAC alleged two causes of action: one under Rule 10b-5(b), and one under both 10b-5(a) and (c). After briefing and oral argument, the district court denied the motion on the basis of futility, for it determined that the amended motion still did not meet the PSLRA's requirement that it allege a strong inference of scienter against the Deloittes. Plaintiffs timely appealed.

---

[1] The district court also dismissed all allegations regarding conduct before July 30, 1999 as time-barred. *In re Royal Ahold*, 351 F. Supp. 2d at 364-68. Thus, the Class Period at issue in this litigation runs from July 30, 1999 to February 23, 2003.

II.

This appeal turns on Ahold's accountants' alleged role in the JV and PA frauds. Accordingly, we shall review the frauds and the Deloittes' roles in them as indicated by the record. Although Ahold began consolidating its joint ventures in 1992, the purported class period did not begin until July 30, 1999. Our discussion of events before that date serves only to provide background for later events.

A.

With respect to the JV fraud, both Deloittes advised Ahold on the consolidation of the joint ventures. Five joint ventures are at issue in this litigation: JMR, formed in August 1992; Bompreço, formed in November 1996; DAIH, formed in January 1998; Paiz-Ahold, formed in December 1999; and ICA, formed in February 2000. Ahold had a 49% stake in JMR and a 50% share of each of the other ventures at their respective times of formation.

Prior to Ahold's entering into the first joint venture, Deloitte Netherlands and Deloitte U.S. gave Ahold advice about revenue consolidation under Dutch and U.S. GAAP. For example, several months before the first joint venture was formed, Deloitte U.S. partner David Herskovits sent Ahold Senior Vice President Cor Sterk a memorandum providing details on the consolidation of joint venture revenue. It explained that control of a joint venture is required for consolidation of the venture's revenue and discussed what situations are sufficient to demonstrate control. The memo indicated that control could be shown by a majority voting interest, a large minority voting interest under certain circumstances, or by a contractual arrangement.

Ahold began consolidating the joint ventures as they were formed. The various Joint Venture Agreements ("JVAs") did not indicate that Ahold controlled the ventures. For example,

the JMR joint venture agreement specified that decisions would be made by a board of directors, "deciding unanimously," and that the board would consist of three members appointed by Ahold and four members appointed by JMH, Ahold's partner in the venture.

However, Ahold represented to Deloitte Netherlands that it nonetheless possessed the control requisite for consolidation. Deloitte Netherlands initially accepted these representations for the consolidation of JMR and Bompreço. But as consolidation continued, the Deloittes became concerned that Ahold lacked the control necessary to consolidate these first two joint ventures. On August 24, 1998, Deloitte Netherlands partner John van den Dries sent a letter to Michiel Meurs, Ahold's CFO, advising him that Ahold's representations of control would no longer suffice, that Ahold would need to produce more evidence of control in order to justify continuing consolidation of joint venture revenue under U.S. GAAP, and that without such evidence a financial restatement would be required.

In response to Deloitte Netherlands' requests, Ahold drafted a "control letter" addressed to BompreçoPar S.A., its partner in the Bompreço joint venture. The letter stated that the parties agreed that if they were unable to reach a consensus decision on a particular issue, "Ahold's proposal to solve that issue will in the end be decisive." After reviewing the draft letter, Deloitte Netherlands advised Ahold that if countersigned by the joint venture partner the letter would be sufficient evidence to consolidate the venture. The letter was signed by Ahold and BompreçoPar in May 1999. By late 2000, Ahold had obtained similar countersigned control letters for the ICA, DAIH, and Paiz-Ahold joint ventures. Based on these letters and other evidence, Deloitte Netherlands concluded that consolidation was appropriate.

However, in October 2002 the Deloittes learned of a "side letter" sent to Ahold in May 2000 by one of Ahold's ICA

joint venture partners, Canica. The letter stated that Canica did not agree with the interpretation of the shareholder agreement stated in the ICA control letter. At this point, Deloitte Netherlands and Deloitte U.S. began trying to get Ahold to obtain an amendment to the shareholder agreement in order to justify ongoing consolidation. At a February 14, 2003 meeting, Deloitte Netherlands and Deloitte U.S. told Ahold that Ahold lacked the necessary control for consolidation.

On February 22, 2003, Ahold revealed to Deloitte Netherlands side letters contradicting the Bompreço, DAIH, and Paiz-Ahold control letters. Two days later, Ahold announced that it had improperly consolidated its joint ventures and would be restating its revenues.

### B.

Now we turn to the PA fraud. Ahold acquired USF in early 2000. Prior to the acquisition, Deloitte U.S. participated in Ahold's due diligence on USF. In a February 2000 memo, Deloitte U.S. noted that USF's internal system for recording promotional allowances received was weak because it heavily relied on vendors' figures, and that the system could "easily result in losses and in frauds." Deloitte U.S. also noted in the memo that USF's use of value added service providers, special purpose entities that bought products from vendors and then resold them to USF for a higher price, needed to be evaluated for their "tax and legal implications and associated business risks."

After Ahold's acquisition of USF was finalized, Deloitte U.S. became USF's external auditor. When performing an Opening Balance Sheet audit of USF, Deloitte U.S. discovered that a USF division in Buffalo, New York had been fraudulently accounting for PA income. This fraud required a restatement of $11 million of PA income. USF also downwardly adjusted its income by $90 million as a result of

Deloitte U.S.'s advice that it be less aggressive in its method for recognizing PA income.

USF used at interim periods a method known as the "PA recognition rate" to estimate promotional allowance income, in which PAs were estimated as a percentage of USF's total sales. The rate used by USF was 4.58 percent at the time of Ahold's acquisition of USF, but rose as high as 8.51 percent in 2002. When USF booked final numbers, Deloitte U.S. in its audits tested USF's recognition of PAs by requesting written confirmation of PA amounts from vendors and by performing cash receipt tests. Using this confirmation process, Deloitte U.S. was able to test between 65 and 73 percent of PA receivables in its audits for 2000 and 2001.

Because USF lacked an internal auditing department, in April 2000 Ahold USA, Inc. (Ahold's American holding company) hired Deloitte U.S. to perform internal auditing services at USF. The internal auditors did not report to the Deloitte U.S. external auditors.[2] Instead, they reported initially to Ahold USA's internal audit director and, later, to USF's internal audit director after he was hired. The audit was managed by Jennifer van Cleave under the supervision of Patricia Grubel, a Deloitte U.S. Partner.

One of the internal audit's objectives was to determine whether USF's tracking of PAs was adequate. In van Cleave's attempt to verify USF's PA numbers, she requested a number of documents from USF management, including vendor contracts. Management refused to produce a number of the requested documents. Several members of management also refused to meet with van Cleave when she asked to conduct exit meetings. Van Cleave was thus unable to complete all of the audit's objectives.

---

[2]Under the professional standards then in effect, an auditing firm could provide both internal and external auditing services to the same client. *See* The American Institute of Certified Public Accountants, Principles of Professional Conduct, § 101.15 (2000). (J.A. 4502-04.)

In a February 5, 2001 draft report, van Cleave described how management's failure to produce requested documents resulted in her inability to complete some of the goals of the audit. Grubel instructed van Cleave to soften the report's language, and the version submitted to Michael Resnick, Director of USF's Internal Audit Department, simply stated that Deloitte U.S. "was unable to obtain supporting documentation for some of the promotional allowance sample items" without more specifically detailing management's failures.

In its February 2003 external audit for 2002, Deloitte U.S. discovered through the PA confirmation process that USF had been inflating its recorded PA income. An investigation ensued. Ultimately, USF's former Chief Marketing Officer ("CMO"), Mark Kaiser, was convicted on all counts of a federal indictment that alleged that he had induced USF's vendors to falsely report PA income amounts and receivable balances to Deloitte U.S. and that he had concealed the existence of written contracts with USF vendors from Deloitte U.S.

Two other USF executives pled guilty to federal securities fraud charges; in their plea colloquies, they admitted that USF lied to and deceived Deloitte U.S., and that they induced vendors to sign false audit confirmation letters that falsely overstated PA payments. In addition, seventeen individuals associated with USF vendors pled guilty to various charges, and admitted that they signed false audit confirmation letters in order to conceal the PA fraud from Deloitte U.S.

III.

A.

In passing the PSLRA in 1995, Congress imposed heightened pleading requirements for private securities fraud actions. As a general matter, heightened pleading is not the norm in federal civil procedure. The drafters of the original

Federal Rules of Civil Procedure rejected technical pleading requirements and instead sought to ensure "that pleadings [would] be construed liberally so as to do substantial justice." *5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure* § 1202, at 87 (3d ed. 2004). Embodying this goal, Federal Rule of Civil Procedure 8 requires merely "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

However, for several reasons it has long been believed that heightened pleading requirements are necessary for allegations of fraud. Frequently stated reasons include protecting defendants' reputations from baseless accusations, eliminating unmeritorious suits that are brought only for their nuisance value, discouraging fishing expeditions brought in the dim hope of discovering a fraud, and providing defendants with detailed information in order to enable them to effectively defend against a claim. *See* 5A *Wright & Miller* § 1296, at 31-39. Thus Rule 9(b) of the Federal Rules creates an exception to Rule 8's relaxed standard. When "alleging fraud or mistake," plaintiffs "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

Under § 10(b) of the Securities Exchange Act, it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . ." 15 U.S.C § 78(j)(b). Pursuant to § 10(b), the SEC has promulgated Rule 10b-5, which forbids employing "any device, scheme, or artifice to defraud, . . . mak[ing] any untrue statement of a material fact or omit[ting] to state a material fact . . . or . . . engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5. Section 10(b) creates a private right of action for purchasers or sellers of securities who have been injured by the statute's violation. *See, e.g.*, *Superintendent of Ins. of*

*State of N.Y. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 13 n.9 (1971).

As § 10(b) prohibits fraud, claims brought under it prior to the PSLRA were governed by Federal Rule of Civil Procedure 9(b), not Rule 8. *Tellabs*, 127 S. Ct. at 2507. However, circuits split on the question of how much factual specificity Rule 9(b) required of complaints alleging claims under § 10(b). *See* William C. Baskin III, Note, *Using Rule 9(b) to Reduce Nuisance Securities Litigation*, 99 Yale L.J. 1591, 1593-94 (1990). Thus, Congress passed the PSLRA to establish a uniform pleading standard that would reduce frivolous securities fraud suits. "As the Committee of Conference that reported the PSLRA noted, '[Rule 9(b)] has not prevented abuse of the securities laws by private litigants. Moreover, the courts of appeals have interpreted Rule 9(b)'s requirement in conflicting ways, creating distinctly different standards among the circuits.'" *Teachers' Retirement Sys. of La. v. Hunter*, 477 F.3d 162, 171 (4th Cir. 2007) (quoting H.R. Rep. No. 104-369, at 41 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 730, 740).

The PSLRA imposed a number of requirements designed to discourage private securities actions lacking merit. Among them is the requirement that in a private securities action "in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C § 78u-4(b)(2). Complaints that do not adequately plead scienter are to be dismissed. *Id.* § 78u-4(b)(3)(A).

Because the PSLRA did not define "a strong inference," the courts of appeals again disagreed on how much factual specificity plaintiffs must plead in private securities actions. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588,

601 (7th Cir. 2006) (listing approaches of different circuits), *vacated and remanded*, 127 S. Ct. 2499. The Supreme Court recently resolved that issue in *Tellabs*, in which the Court prescribed the following analysis for Rule 12(b)(6) motions to dismiss § 10(b) actions:

> *First,* . . . courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true . . . .

> *Second*, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss . . . . The inquiry, as several Courts of Appeals have recognized, is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.

> *Third,* in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences . . . . The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? . . . . [T]he inference of scienter must be more than merely "reasonable" or "permissible" — it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

127 S. Ct. at 2509-10 (citations and footnote omitted).

To be sure, by no means did the PSLRA or the Supreme Court eliminate the private right of action in § 10(b), which remains "an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the [SEC]." *Tellabs*, 127 S. Ct. at 2504. The "strong inference" requirement is not meant to prevent litigants with meritorious claims from continuing to uncover fraud and ensure confidence in the securities markets. Rather, the requirement aims to weed out meritless claims at the pleading stage, without forcing defendants to go through a potentially costly discovery process.

Thus, as directed by *Tellabs*, we must analyze the factual allegations raised by the plaintiffs, as well as other evidence in the record, and determine what plausible inferences we can draw from them. Having drawn all plausible inferences, we may reverse the district court only if we find the inference that Deloitte Netherlands and Deloitte U.S. acted with scienter "at least as compelling" as the inference that the defendants lacked the required mental state. In this endeavor, we "must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 127 S. Ct. at 2510. It is to this comparative analysis that we now turn.

B.

The "strong inference" requirement and the comparative analysis of inferences still leave unanswered the question of exactly what state of mind satisfies the scienter requirement of a 10b-5 action. In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976), the Supreme Court held that a plaintiff must show that the defendant possessed the "intent to deceive, manipulate, or defraud" in an action brought under § 10(b) and Rule 10b-5. *Id.* at 193. However, the Court has never made clear what mental state suffices to meet this requirement. *See id.* at 193-94 n.12 ("We need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil

liability under s 10(b) and Rule 10b-5."); *Tellabs*, 127 S. Ct. at 2507 n.3 ("The question whether and when recklessness satisfies the scienter requirement is not presented in this case.").

This court has held that "a securities fraud plaintiff may allege scienter by pleading not only intentional misconduct, but also recklessness." *Ottman v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 344 (4th Cir. 2003). We have defined a reckless act in the § 10(b) context as one "'so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* at 343 (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir. 1999)). A showing of mere negligence, however, will not suffice to support a § 10(b) claim. *See Ernst & Ernst*, 425 U.S. at 199.

Thus, the question is whether the allegations in the complaint, viewed in their totality and in light of all the evidence in the record, allow us to draw a strong inference, at least as compelling as any opposing inference, that the Deloitte defendants either knowingly or recklessly defrauded investors by issuing false audit opinions in violation of Rule 10b-5(b) or 10b-5(a) and (c). If we find the inference that defendants acted innocently, or even negligently, more compelling than the inference that they acted with the requisite scienter, we must affirm.[3] Plaintiffs must show that defendants actually made a misrepresentation or omission in their audit opinions on which investors relied; parties who merely assist another

[3]We review a district court's denial of a motion for leave to amend a complaint for abuse of discretion. *Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008). However, because the district court denied leave to amend because it determined that the amended complaint would not survive a motion to dismiss, we review that legal conclusion de novo. *See HCMF Corp. v. Allen*, 238 F.3d 273, 277 n.2 (4th Cir. 2001).

in violating § 10(b) are not liable under § 10(b).**⁴** *See Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008).

IV.

A.

In light of the foregoing standards, we consider first the JV fraud. Plaintiffs allege that Deloitte U.S. and Deloitte Netherlands allowed Ahold to consolidate the joint ventures despite knowing, or being reckless with regard to the risk, that Ahold lacked the control required for consolidation. The thrust of plaintiffs' argument is that the control letters and Ahold's oral representations were insufficient evidence of control under Dutch and U.S. GAAP. Thus, they argue, the defendants were complicit in the fraud. According to plaintiffs, the secret side letters, in which the joint venture partners contradicted Ahold's interpretations of the joint venture agreements in the control letters, are irrelevant because the control letters themselves did not amend the joint venture agreements.

Plaintiffs' arguments do not provide a basis for a strong inference that either Deloitte U.S. or Deloitte Netherlands acted knowingly or recklessly in relation to the JV fraud. The most plausible inference that one can draw from the fact that Ahold concealed the side letters from its accountants is that the accountants were uninvolved in the fraud. Ahold produced letters attesting to Ahold's control countersigned by Ahold's

---

**⁴**The SAC recounts a number of alleged misrepresentations by Deloitte Netherlands, including audit opinions issued in conjunction with Ahold's 1999 SEC Form 20-F, 2000 Form 20-F, 2001 Form 20-F, and Ahold's September 2001 Prospectus Supplement. Defendants contend in their brief that Deloitte U.S. did not issue any audit opinions on Ahold's or USF's financial statements. *Brief of Appellees* at 1-2. Because this case was briefed and argued purely as a scienter case, and because defendants make no argument that *Stoneridge* precludes liability, we do not consider the applicability of that case.

partners for the ICA, Bompreço, DAIH, and Paiz-Ahold joint ventures at the Deloitte defendants' request, all the while concealing the side letters from those same defendants. These facts lead to a strong inference that the Deloitte defendants were attempting to ensure that Ahold had sufficient control over the joint ventures for consolidation and that Ahold was determined to prevent them from discovering otherwise.

With perfect hindsight, one might posit that defendants should have required stronger evidence of control from Ahold. Indeed, as the district court noted, it may have been negligent for defendants to accept as the only evidence of control Ahold's repeated representations that it controlled JMR, the one joint venture for which Ahold never produced a control letter. *See In re Royal Ahold*, 351 F. Supp. 2d at 395-96.[5] Nonetheless, the evidence as a whole leads to the strong inference that defendants were deceived by their clients into approving the consolidation. Ahold would not have needed to go out of its way to produce false evidence of control had the Deloittes been complicit in the fraud, or had they been so reckless in their duties that their audit "amounted to no audit at all," as the Southern District of New York has described the standard. *S.E.C. v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992) (citing *McLean v. Alexander*, 599 F.2d 1190, 1198 (3d Cir. 1979)).

In order to establish a strong inference of scienter, plaintiffs must do more than merely demonstrate that defendants should or could have done more. They must demonstrate that the Deloittes were either knowingly complicit in the fraud, or so reckless in their duties as to be oblivious to malfeasance that was readily apparent. The inference we find most compelling based on the evidence in the record is not that the defendants were knowingly complicit or reckless, but that they were

---

[5]Because JMR comprised a relatively small portion of Ahold's financial results, the district court found that any financial misstatement resulting from its consolidation was immaterial. 351 F. Supp. 2d at 395-96.

deceived by their client's repeated lies and artifices. Perhaps their failure to demand more evidence of consolidation was improper under accounting guidelines, but that is not the standard, which "requires more than a misapplication of accounting principles." *Price Waterhouse*, 797 F. Supp. at 740.

B.

Next we examine the PA fraud. Plaintiffs argue that Deloitte U.S. was knowingly complicit in the fraud when it ignored several "red flags," including: USF's lack of internal controls to track PA income; USF management's obstruction of the internal audit; and the facts and the circumstances of USF Chief Financial Officer Ernie Smith's resignation.[6]

With respect to USF's problems with tracking income with PAs, it is not the case that Deloitte U.S. simply ignored the weak internal controls, as plaintiffs allege. Rather, Deloitte U.S. raised this issue numerous times with Ahold and USF management. Deloitte U.S. designed a confirmation process to verify USF's reported PA income in which it contacted third-party vendors and received letters from them confirming PA amounts.

In the SAC plaintiffs describe the confirmation process as one that "confirmed nothing." Yet instead of merely relying on USF CMO Mark Kaiser's representations, as plaintiffs assert, Deloitte U.S. obtained corroboration from vendors for the figures provided by USF. Deloitte U.S. would not have attempted to verify USF's figures with third parties if it were complicit in the scheme; nor can it be said that it was anything but proper to attempt to check the accuracy of representations made by USF management.

---

[6]Plaintiffs do not distinguish Deloitte U.S. and Deloitte Netherlands in their complaint, but they have failed to challenge the district court's conclusion that the two firms are separate legal entities.

Plaintiffs attempt to suggest that the confirmation process was unsound because, for example, Deloitte U.S. accepted confirmation letters via fax and the letters were sent to brokers or sale executives instead of financial officers. But even if the confirmation process was somewhat flawed — which defendants contest — the larger fact remains that the PA fraud went undetected initially only because USF and its vendors conspired to lie to Deloitte U.S. and to conceal important documents. Indeed, it was Deloitte U.S.'s confirmation process itself that ultimately revealed the fraud. In the course of the 2002 audit, Deloitte U.S. learned in early 2003 from a vendor from which it had requested PA confirmations that employees had signed inaccurate confirmation letters. Shortly thereafter, Ahold authorized an internal investigation that revealed the extent of the fraud. No doubt it would have been better had the fraud been discovered earlier, but the strongest inference one can draw from the evidence is that the fraud initially went undetected because of USF's collusion with the vendors, not because of wrongdoing by Deloitte U.S.

As to the internal audit, the internal auditors reported not to the Deloitte U.S. external auditors but to USF, as was consistent with professional standards. *See* Standards for the Professional Practice of Internal Auditing, Statements on Internal Auditing Standards Nos. 1-18, § 230. Plaintiffs suggest that Grubel's editing of the language in van Cleave's initial report indicates scienter. They argue that Grubel's edits suggest that Deloitte U.S. was trying to cover up the fact that management had obstructed the internal audit. But as the district court noted, "while [the] language in the initial draft of the internal audit report was softened, the revised language continued to state the essential point, that the internal auditors had been unable to obtain certain documents related to promotional allowances and unable to achieve specific testing objectives." J.A. 6122.

The rest of the supposed "red flags" pointed to by plaintiffs also fail to create a strong inference of scienter. With respect

to plaintiffs' allegations that Smith told Deloitte U.S. about the vendor rebate fraud, the district court twice concluded that this claim had no support in the record, and we see no reason to disagree with its conclusion. Plaintiffs allege that facts like the high CFO turnover at USF and USF's rapid growth should have alerted Deloitte U.S. that there was fraud afoot, but they do not explain why this was the only conclusion Deloitte U.S. could have drawn without being reckless. There are many possible reasons other than fraud for high personnel turnover — personality conflicts, lack of opportunities for advancement, salary and compensation disputes, to name a few.

Seeing the forest as well as the trees is essential. With respect to both frauds, plaintiffs point to ways that defendants could have been more careful and perhaps discovered the frauds earlier. But plaintiffs cannot escape the fact that Ahold and USF went to considerable lengths to conceal the frauds from the accountants and that it was the defendants that ultimately uncovered the frauds. The strong inference to be drawn from this fact is that Deloitte U.S. and Deloitte Netherlands lacked the requisite scienter and instead were deceived by Ahold and USF. That inference is significantly more plausible than the competing inference that defendants somehow knew that Ahold and USF were defrauding their investors.

It is not an accountant's fault if its client actively conspires with others in order to deprive the accountant of accurate information about the client's finances. It would be wrong and counter to the purposes of the PSLRA to find an accountant liable in such an instance. Because we find no version of the facts creates a strong inference that the Deloitte defendants had the scienter required for a cause of action under § 10(b), the district court rightly denied the plaintiffs' motion for leave to amend their complaint.

V.

We establish no blanket immunity for accountants for otherwise actionable statements with a strong inference of

scienter. But in this case, the stronger and more plausible inference is that the Deloittes were, like the plaintiffs, victims of Ahold's fraud rather than its enablers. Plaintiffs' action is the paradigm situation to which the PSLRA and *Tellabs* were meant to apply. Accordingly, the judgment below is

*AFFIRMED*.