In re MUTUAL FUNDS INVESTMENT LITIGATION

In re Janus and Putnam Subtracks

Marini et al.

v.

Janus Investment Fund et al.

MDL No. 04–MD–15863.
Civil No. JFM–04–497.

United States District Court,
D. Maryland.

June 12, 2009.

## OPINION

J. FREDERICK MOTZ, District Judge.

On December 30, 2008, I issued an opinion addressing summary judgment motions filed by defendants in the Janus and Putnam subtracks. *In re Mut. Funds Inv. Litig.*, 590 F.Supp.2d 741 (D.Md.2008). As to Janus, I found that while the arranged market timing agreements entered into by Janus constituted a 10b–5 violation, plaintiffs had been fully compensated by Janus's regulatory settlement. *Id.* at 751–52. Therefore, I granted summary judgment in favor of the Janus defendants as to the arranged timing. *Id.* at 752. I requested supplemental briefing on the issue of defendants' sciénter as to non-arranged market timing. *Id.* at 753. With the benefit of this additional briefing, I now find that plaintiffs do not present sufficient evidence of defendants' scienter to survive summary judgment.

### I.

█ A securities fraud plaintiff can establish scienter through a showing of intentional misconduct or recklessness. *Pub. Employees' Ret. Ass'n of Colorado v. Deloitte & Touche LLP*, 551 F.3d 305, 313 (4th Cir.2009). The Fourth Circuit has defined a reckless act in the context of Section 10(b) "as one 'so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* (*quoting Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 343 (4th Cir.2003)).

Liability in this case potentially arises under Rule 10b–5 because the Janus fund prospectuses indicated that Janus recognized the harmfulness of market timing

and was taking steps to control it, yet omitted to state that Janus was in fact intentionally and/or recklessly permitting market timing to occur. Therefore, the relevant scienter inquiry is whether defendants' efforts in attempting (but failing) to control non-arranged market timing were intentional or reckless, or whether their efforts were in good faith or, at worst, negligent.

## II.

It cannot be disputed that Janus knew market timing was rampant and harmful to the performance of its funds. An internal report drafted in November 2002, commissioned by Mark Whiston, Janus's former CEO, stated that "market timers hurt everyone except themselves" and listed three ways that market timers can adversely impact funds and shareholders. (Pls.' Ex. 14, at 012021.) The report stated that the Janus Internal Operations group estimated market timing activity to be on average slightly below 1% of daily flows, with the daily amount ranging from $20 million to $400 million. (Id. at 012022.) The report recounted the Institutional Operations group's concern that market timing had increased significantly as a percentage of flows because overall flows at Janus were down (making timers a larger percentage) and because of difficult market conditions.[1] (Id.)

The internal report estimated that Janus's timing activity was not as large as industry averages because Janus's main international funds were "closed to new investors on the no-load side," and Janus was "diligently policing timers with most of [its] distribution partners." (Id.) The report found, however, that timers were slipping through Janus's policing mechanisms by using smaller trades and hiding in third-party and omnibus relationships "where timing activity is difficult to uncover and police."[2] (Id.) Market timers would also submit trades under multiple identification numbers, use false names or registrations, split trades, or trade through multiple brokerage firms. (See Defs.' Supp'l Mem. 8–9; Defs.' Ex. 130 [Feb. 2003 e-mail stating that "brokers are starting to create in rep codes and are transferring out of their targeted rep code to a new one"]; Defs.' Ex. 132 [June 2003 e-mail noting that timers in Janus funds were using multiple numbers]; Defs.' Ex. 23, App. A ¶ 14[Jan. 2002 e-mail from Janus employee stating, "Wilshire has been timing our funds since the beginning of time. They have opened accounts with us under dozens of registrations. We kick them out, they move to another custodian. It's a fun little game."].)

As I recounted in my December 2008 Order, Janus adopted many mechanisms throughout the class period to detect and deter non-arranged market timing. See In re Mut. Funds Inv. Litig., 590 F.Supp.2d at 752. Plaintiffs assert in their supplemental briefing that Janus's delay in implementing redemption fees, low market timing detection thresholds, and lack of

---

1. Given this report, John Mari's Declaration, and the abundance of other evidence concerning market timing in Janus's funds, defendants' argument that CFA has not identified non-arranged timing is without merit. (See Supp'l Mem. for the Janus Defs. Addressing Scienter ("Defs.' Supp'l Mem.") 3–4.)

2. The report notes a third reason that timers slipped through Janus's mechanisms: the timers were "Janus-approved timers and thus, not being monitored and policed." (Pls.' Ex. 14, at 012022.) As indicated above, I found in my December 2008 Order that plaintiffs' claims based on arranged market timing did not survive summary judgment because defendants' payments pursuant to regulatory settlements fully compensated plaintiffs for damages caused by arranged timing. In re Mut. Funds Inv. Litig., 590 F.Supp.2d at 751–52.

written policies provide evidence of intentionality and/or recklessness.

*Redemption Fees*

■ Plaintiffs assert that Janus purposely delayed imposing redemption fees in its funds. (Pls.' Supp'l Mem. Addressing Scienter ("Pls.' Supp'l Mem.") 7.) The evidence shows otherwise. Sandy Rufenacht, Portfolio Manager of the Janus High–Yield Fund, wrote in November 1999 that "the timers have crushed the performance of the Janus High Yield Fund this year." (Pls.' Ex. 11.) Rufenacht requested that a redemption fee be added to the fund, or, citing Janus's reluctance to impose redemption fees, that the Fund be pulled from the supermarket platforms. (*Id.*) A redemption fee was added to the High–Yield Bond Fund in June 2000, only seven months after Rufenacht's e-mail. (Defs.' Ex. 23 ¶ 14.)

Jason Yee, who managed international funds, wrote in a September 2002 e-mail that "market timers and daily flows of 8–12% of the ENTIRE FUND are making it impossible to manage Global Value prudently." (Pls.' Ex. 13.) In this e-mail, Yee told John Mari, Vice President of Global Strategy and Business Intelligence, "I know that you have been working hard on shutting those folks down, but quite frankly the situation seems to [be] getting worse rather than better." (*Id.*) Yee suggested a back-end load or a short-term trading fee. (*Id.*) In December 2002, Yee wrote that given the small size of the International Value fund, timers were extremely disruptive and had stolen a large amount of performance from the fund over a one week period. (Pls.' Ex. 12.) Yee also noted in this e-mail that due to the good work of John Mari and his group, market timing in another fund was "down to a seemingly 'manageable' level." (*Id.*) In February 2003, only five months after Yee's September 2002 e-mail, redemption fees were added to Janus's international,

global, and INTECH funds—including the funds referenced in Yee's e-mails. (Defs.' Ex. 23 ¶ 14.) In fact, Whiston testified that he requested the internal market timing report in late 2002, discussed above, for the purpose of having "ammunition" to argue for redemption fees before the Trustees. (Whiston Dep. 124:25–125:21, Feb. 7, 2008, Defs.' Ex. 68.) At that point in 2002, Whiston "thought [Janus] had done really everything [it] could think of to stop timers," and Whiston "was at a place personally where [he] felt redemption fees was the only remaining act that [Janus] could employ." (*Id.*)

Therefore, despite an e-mail by a Janus employee in November 2002 stating that Janus was "actually one of the last big complexes to adopt [redemption fees]" (Pls.' Ex. 20), the evidence shows that redemption fees were timely implemented by defendants. This is especially true given that approval from the Fund Trustees was required before redemption fees could be implemented, redemption fees could be costly, and some intermediaries could not support redemption fees. (Defs.' Ex. 23 ¶ 14, Ex. V; Pls.' Ex. 12 [Dec. 2002 e-mail from Robin Beery stating that "it's often difficult to get our distributor partners to enforce a redemption fee"].)

*Detection Thresholds*

■ Plaintiffs claim that Janus set artificially high dollar trade thresholds to monitor timing, and did not monitor trades below those thresholds. (Pls.' Supp'l Mem. 4.) Plaintiffs point to John Mari's SEC deposition, where he responded "No" when asked, "Was your group doing anything to monitor or police market timing trading for trades that were underneath the [daily large trades reports and the thresholds for the different funds]?" (Mari Dep. 11:16–22, Feb. 24, 2004, Defs.' Ex. 146.) However, Mari testified further that "[i]f there were timers detected un-

derneath those thresholds and we saw significant activity, they would have been restricted like anybody else." (*Id.* 12:1–5.) Moreover, according to plaintiffs, "virtually all of the timing . . . was well above the [ ] thresholds [established by Janus] and therefore 'on the radar' of Janus." (Pls.' Responsive Mem. Addressing Scienter 6.) Of the 118 accounts responsible for 90% of the dilution identified by plaintiffs' proposed expert Marc Vellrath, defendants detected market timing in the vast majority of them. (Pls.' Ex. 23, App. A.) Any problem, then, with Janus's handling of market timing, did not lie in its detection procedures.

*Written Policies*

█ Plaintiffs also criticize Janus for failing to have written procedures in the intermediary channel until 2001, and written procedures in the retail channel throughout the class period. (Pls.' Supp'l Mem. 6–7.) It is worth noting that the SEC did not require mutual funds to adopt and disclose written timing policies until 2004. (Defs.' Ex. 150.) More importantly, plaintiffs fail to show why it matters in determining recklessness that Janus failed to write down the efforts it was making to stop market timing.

█ Even if plaintiffs are correct that Janus should have implemented redemption fees earlier, lowered the monitoring thresholds, and established written policies, plaintiffs would only prove a case of negligence or corporate mismanagement— not a fraud claim. Janus's failure to act as aggressively as they could have, or should have, does not establish intentionality or recklessness. *Cf. Pub. Employees,* 551 F.3d at 314 ("In order to establish a strong inference of scienter, plaintiffs must do more than merely demonstrate that defendants should or could have done more.").

### III.

█ In determining whether plaintiffs have presented sufficient evidence of Janus's scienter to survive summary judgment, I must consider not only Janus's efforts to detect and deter market timing, but also Janus's treatment of market timers it identified.

As an initial matter, I note that the avenues available to Janus in handling identified market timing depended upon whether the timing trade was made through a retail channel or a type of intermediary channel. In the retail channel, individual investors trade directly with Janus; those trades were completely transparent to Janus. As for intermediary channels, there are two types of trades: trades submitted electronically through the automated National Securities Clearing Corporation ("NSCC") platform, and trades submitted manually through Janus's institutional services group ("non-NSCC"). Most non-NSCC trades were submitted by omnibus accounts. (Defs.' Ex. 23 ¶ 9(a).) "An omnibus account is a pooled account, meaning that multiple trades are bundled and submitted together under a single account number. . . . Omnibus accounts include broker/dealers, insurance companies, trust companies, banks, and other financial intermediaries." (*Id.*) Of the trades submitted through the automated NSCC platform, Janus identifies three sub-types, with varying levels of transparency into the underlying investors. First, Matrix Level 3 accounts are broker-controlled and provided the most transparency, as Janus could see on its transfer-agency system the individual broker identification numbers ("BINS"). (*Id.* ¶ 10(a).) Second, supermarket accounts are full-service financial institutions, such as Fidelity and TD Waterhouse, that offer multiple trading options for their clients. (*Id.* ¶ 11(a).) The ability of Janus to view un-

derlying trading activity in supermarkets varied, but, in any event, Janus had no access to the underlying investors' names or account numbers.[3] (*Id.*) Third, a catch-all category of the remaining NSCC trades contained omnibus trades that varied in transparency. (*Id.* ¶ 12(a).) Some of these accounts identified the underlying investors by BIN numbers; in other accounts, Janus could not see the underlying activity.

A review of the record reveals Janus's extensive efforts in warning and restricting accounts it identified as market timers. A log of warnings and restrictions, created by the Institutional Services group, made to accounts trading in intermediary channels shows that between January 2001 and September 2003, Janus restricted 926 accounts. (Defs.' Ex. 145.) Another log shows that between March 1999 and February 2004, Janus restricted and/or warned 1,600 accounts. (Defs.' Ex. 104; *see also* Defs.' Ex. 119 [listing restrictions of intermediary accounts] ); (Defs.' Ex. 120 [listing timing activity of and restrictions on intermediary accounts].) As for retail accounts, Janus sent hundreds of warning letters and terminated the exchange privileges for hundreds of account/fund combinations. (*See* Defs.' Ex. 121 [listing activity in retail accounts and actions taken by Janus]; Defs.' Ex. 122 [listing the account/fund combinations for which exchange privileges were terminated in 2002].)

In at least one instance, Janus terminated the trading privileges of an account of a branch of a major brokerage firm, after warnings and restriction letters proved ineffective in stopping the market timing. (Defs.' Exs. 123 & 124.) Janus rejected entire omnibus trades on at least two dates in 2002. (*See* Defs.' Ex. 23, App. A ¶¶ 19 & 31 [rejection of two purchases on August 15, 2002, and one purchase on October 8, 2002, by an account trading in variable annuity contracts]; 58 [rejection of two purchases on August 15, 2002, by an account trading in variable annuity contracts] ); 75 [rejection of two purchases on August 15, 2002, by an account trading in variable annuity contracts]. At one point, Janus threatened to terminate a Fund/SERV agreement, stating in an e-mail to the intermediary, "We have seen an increase in timing assets again and are at a point where we need some assistance, or terminate the FundSERV agreement.... Janus does not want any timed assets in any of our funds."[4] (Defs.' Ex. 128.)

For purposes of summary judgment, Janus used a list that contained, according to plaintiffs' proposed expert Vellrath, the ten most harmful accounts and the 118 accounts that caused 90% of the dilution in Janus funds. John Mari prepared a sixty-five page analysis recounting the efforts made by Janus to stop market timing in those accounts. (*See* Defs.' Ex. 23, App. A.) Eighteen retail accounts were part of this group.[5] Janus identified market timing during the class period in ten of these

---

**3.** Transparency in a supermarket account depended upon whether the supermarket offered a "portal." Even if the supermarket provided an on-line portal, as Fidelity did, Janus could only view trades for a given day, not account history, and the portal only showed buys and sells, not exchanges. Moreover, as noted above, the portals did not identify the underlying investors by name or account number.

**4.** Of course, Janus's explicit agreements to allow timed assets in its funds ("arranged timing") show that Janus *did* want timed assets in its funds—but *only* if the timed assets came with long-term money (so-called "sticky assets").

**5.** Janus notes that hundreds of thousands of retail investors traded in the Janus funds during the class period. (Responsive Mem. for the Janus Defs. Addressing Scienter 3.)

eighteen accounts, and plaintiffs do not dispute that nine of these identified timing accounts were restricted by Janus. (*See* Consolidated Statement of Material Facts ("CSMF") ¶ 130.) The remaining 100 accounts were intermediary accounts. Of these accounts, Janus identified timing in approximately eighty-two of them. (*See* Defs.' Ex. 23, App. A; CSMF ¶ 127.) Of these eighty-two accounts, Janus produced evidence that Janus issued or requested warnings and/or restrictions for approximately fifty-three accounts. (*See* Defs.' Ex. 23, App. A; CSMF ¶¶ 74, 136.)

The question, then, is whether Janus's failure to do more in response to identified timing in intermediary/omnibus accounts provides evidence sufficient for plaintiffs to withstand summary judgment. I find that it does not. It is important to note the difficulties Janus faced in dealing with timing in intermediary accounts—accounts owned by large clients that regularly submitted omnibus or pooled trades. As discussed above, Janus's ability to access underlying information concerning the investors making the trades that were submitted to Janus in omnibus accounts varied. During the class period, financial intermediaries were not required to provide transaction-level data to Janus, and some did not. The cooperation of the intermediary was required to take action against market timers making trades through an omnibus account; the intermediary did not always provide it.[6] Additional difficulties existed in restricting insurance companies trading in variable annuity contracts in the Aspen funds, because these relationships were also governed by state contracts which often permitted trades up to ten times per year. (Defs.' Ex. 23, App. A, at 9.)

While ideally Janus would have documented warnings and restrictions for each account in which it identified market timing, the lack of this evidence does not create an inference of recklessness. Warnings and restrictions may have been requested over the phone or in person. (*See* Defs.' Ex. 23 ¶ 9(b) ["Communications with the intermediaries, including restriction requests, typically occurred through telephone calls. We held face-to-face meetings with the sales and back-office personnel of many financial intermediaries...."].) Janus may have resolved market timing in an omnibus account more informally, without the need to resort to warnings or restrictions. (*See, e.g.*, Defs.' Ex. 109 [Dec. 2002 e-mail from James Levy stating, "I don't think we need to send a letter now[,] if you are confident that the money will stay put."]; Defs.' Ex. 140 [Aug. 2003 e-mail from Janus employee recounting a telephone conversation and stating, "At this point I don't think we need to generate a warning letter but I made sure he knew that if it happened again he'd receive a warning letter...."].) Even though Janus may not have warned or restricted every intermediary account that potentially contained timing, the record is replete with evidence that Janus was

---

**6.** As the SEC later found, "[i]ntermediaries currently may not enforce funds' market timing restrictions on their customers because ... it is not in the intermediary's interest to do so. Accordingly, even if funds receive shareholder trading information, ... it will have little practical value if the fund is unable to prevail upon the intermediary to enforce its market timing policies." 70 Fed.Reg. 13,332 (Mar. 18, 2005) (footnote omitted) (attached as Defs.' Ex. 53). The SEC issued new regulations after the class period requiring intermediaries that maintain omnibus accounts to provide, upon request and pursuant to a required written agreement with the fund, taxpayer ID numbers of all shareholders transacting through the intermediary, the amounts and dates of such transactions, and also requiring intermediaries to restrict transaction activity by a shareholder that a fund identifies as violating its market timing policies. (Defs.' Exs. 52, 53.)

working with these large intermediaries on a broader level to address market timing. (*See, e.g.,* Defs.' Exs. 112, 113, 116, 117, 127, 128, 137; Defs.' Ex. 23, App. A ¶¶ 29, 46, 48, 62, 71, 75, 77, 81, 116.)

More importantly, it is nonsensical that Janus would make serious efforts towards fifty-three intermediary accounts yet recklessly or intentionally fail to address timing in the other identified timing accounts. Because "the factual context renders [plaintiffs'] claim implausible ... plaintiffs must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Plaintiffs posit that because Janus generated revenue from the volume of assets managed, it was not in Janus's financial interest to aggressively restrict market timing.[7] The efforts by Janus to stop market timing, detailed above, do not reveal a failure by Janus to aggressively restrict market timing. If Janus had hoped to enhance its revenue, specifically its management fees, by turning a blind eye to market timing, it would not have gone to these lengths to stop market timers. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (internal quotation marks and citation omitted). While Janus could have, and likely should have, done more to restrict the accounts it identified as market timers, a rational factfinder could not find that their actions amounted to intentional misconduct or recklessness under the applicable legal standard.

Therefore, summary judgment is granted for defendants as to non-arranged mar-ket timing. This grants defendants' motion for summary judgment as to the 10b–5 claims in its entirety. A separate order implementing this ruling follows.

## ORDER

For the reasons stated in the Opinion being entered herewith, it is, this 12th day of June, 2009,

ORDERED:

1.  Defendants' summary judgment motion is granted; and

2.  Judgment is entered in favor of defendants Janus Capital Group Inc., Janus Capital Management LLC, and Janus Distributors LLC, against plaintiffs.

---

7.  Whether this allegation, even if true, lends merit to plaintiffs' fraud claim is questionable. *See Cozzarelli v. Inspire Pharms. Inc.,* 549 F.3d 618, 627 (4th Cir.2008) (noting that "motivations to raise capital or increase one's own compensation are common to every company and thus add little to an inference of fraud").